Max SHIFLET, Appellant,

v.

The STATE of Texas, Appellee.

No. 812–82.

Court of Criminal Appeals of Texas,
En Banc.

Oct. 9, 1985.

Robin D. Orr, Oren B. Hamlin, Bay City (Court-appointed), for appellant.

Jack Salyer, Dist. Atty., Bay City, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

TEAGUE, Judge.

Max Shiflet, appellant, was convicted by a jury for committing the offense of murder of Diana Kaiser. The trial judge assessed appellant's punishment at life imprisonment in the Department of Corrections. The Corpus Christi Court of Appeals affirmed. See *Shiflet v. State*, 653 S.W.2d 830 (Tex.App.—Corpus Christi 1982). We granted appellant's petition for discretionary review in order to make the determination whether the court of appeals correctly held that at the time that appellant, who was then a deputy sheriff for Wharton County, made an oral admission against interest, which was later reduced to writing, he was not then in the custody of Carl Weathers, a Texas Ranger, and Earl Winebrenner, the Chief Deputy for

the Wharton County Sheriff's Department.[1] Because we find that the court of appeals reached the right result, that the appellant's oral admission against interest was admissible evidence, because when he made the admission he was not in custody, we will affirm its judgment.

This Court's predecessor, the Court of Appeals, established long ago the general rule that oral confessions of guilt, or oral admissions against interest, made by one in custody are inadmissible evidence because they are so liable to be misunderstood, so easily fabricated, and so hard to be contradicted. See *Gay v. State*, 2 Tex.App. 127 (1877), and *Riley v. State*, 4 Tex.App. 538 (1878).

■ Today, except in the most limited of circumstances, and unless made in compliance with the provisions of Art. 38.22, V.A. C.C.P., oral confessions of guilt, or oral admissions against interest, made by a suspect who is in custody, are not admissible evidence. Also see *Butler v. State*, 493 S.W.2d 190 (Tex.Cr.App.1973).

■ However, if the person who makes an oral confession of guilt, or an oral admission against interest, is not in custody, a different rule applies.

Art. 38.22, Section 5, V.A.C.C.P., provides in pertinent part: "Nothing in this article precludes the admission of a statement made by the accused ... that does not stem from custodial interrogation ..." Thus, an oral admission against interest or an oral confession of guilt, which does not stem from custodial interrogation, and is given freely, voluntarily and without compulsion or persuasion, is admissible evidence against the accused. Also see Art. 38.21, V.A.C.C.P.

■ Therefore, the first question that we must decide is whether the oral admission against interest that appellant made to Weathers and Winebrenner was the product of custodial interrogation.

---

1. Appellant orally stated to Weathers and Winebrenner that "he was convinced that he did in fact stop Diana Kaiser with his patrol car, that

he did in fact shoot Diana Kaiser, and that he did in fact place her body under the culvert where she was found."

In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court stated: "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S., at 444. In a footnote, the Court indicated that the concept of "custodial interrogation" was what it had in mind in its decision of *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), when it set restrictions on questioning out of the presence of counsel after the investigation of the police had "focused" on the suspect. However, "focus" does not necessarily amount to "custody." *Beckwith v. United States,* 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976); *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977).

From the above, two concepts, the custody concept and the focus concept, have evolved. The distinction between the two concepts is an important one, because it embodies the difference between an objective and a subjective standard for determining when the requirements of the Fifth Amendment and Art. 1, Section 9, Texas Constitution, are triggered. If the focus concept is used, then, in making the determination whether the suspect is in custody, the inquiry must be directed solely to the thoughts of the police officer—his intentions in questioning the suspect, whether he believed he had probable cause to act, and the point in time at which such probable cause developed. If the custody concept is used, then the inquiry shifts to the suspect and what he could reasonably perceive—whether a reasonable person would believe that his freedom was being deprived in a significant way. This requires reference to all of the circumstances of the interrogation to make an objective determination whether custody can reasonably be inferred. However, one commentator, see Ringel, *Searches & Seizures, Arrests and Confessions* (2nd Edition 1985 revision), has pointed out that in the absence of objective facts to indicate that the suspect's view of the situation was reasonable, no court has yet accepted the subjective view

of the suspect as determinative of the issue of custody. In *Beckwith v. United States,* supra, the Supreme Court rejected the use of focus as a concept distinct from custody. Notwithstanding this Court's decision of *Stone v. State,* 583 S.W.2d 410 (Tex.Cr. App.1979), this Court does not appear to have completely jettisoned the concept of focus in making the determination whether the suspect was in custody, *McCrory v. State,* 643 S.W.2d 725 (Tex.Cr.App.1983), nor does it appear that the Supreme Court has jettisoned the concept of focus in making that determination. *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

Therefore, in making the determination whether the appellant was in custody when he made his oral admission to Weathers and Winebrenner, we will use both concepts. Cf. *McCrory v. State,* supra.

█ If we find that at the time appellant made his oral admission to the officers he was not in custody, and also find that his oral admission was given freely, voluntarily and without compulsion or persuasion, then we will hold that it was admissible, and not inadmissible, evidence.

Briefly, the facts that led to the appellant making his oral admission are as follows: In the early morning hours of January 6, 1977, Donald Branson, a truck driver, saw a Chevrolet "Luv" pickup truck, that he knew that Kaiser, the deceased, had driven in the past, parked on the side of Highway 59 just north of the town of Hungerford, which is located south of the City of Wharton. Branson also saw parked behind the pickup truck a white four door sedan vehicle, with red lights on its top, insignia on the door, and several antennaes located thereon, which vehicle he identified as a "County Mounty's" vehicle. Another truck driver testified that shortly before this he had been conversing with Kaiser over his CB radio. He also saw the "County Mounty's" vehicle. However, the truck drivers did not notice any persons in or around either of the parked vehicles. Soon thereafter, Kaiser was reported missing. Her pickup truck was found at another location.

Appellant, who was then a deputy sheriff for Wharton County, and who had been assigned the duty of patrolling that part of Wharton County where Kaiser and her vehicle were last seen on the night of January 5th, was one of the investigating officers. Appellant conducted interviews with truck drivers who had driven on this portion of Highway 59 the night Kaiser disappeared. Appellant reported to Winebrenner that the truck drivers had told him that the "County Mounty" vehicle they had seen was colored brown or tan. Any persons driving such a described vehicle immediately became subject to investigation.

Nothing of any significance occurred until September 6, 1977, when the remains of Kaiser's body were found at a location different from where she had last been seen.

An intensive investigation then ensued. A lot of "backtracking" investigation was done by law enforcement personnel.

The truck drivers were reinterviewed, but by law enforcement personnel other than appellant. It was learned from the reinterviews that the truck drivers had actually reported to appellant that the color of the "County Mounty" vehicle that they had seen parked near Kaiser's vehicle was not colored brown or tan, as appellant had reported, but, instead, was colored white. The investigation then centered on any vehicle colored white, that had an insignia on the side door, red lights on the top, and several antennaes situated thereon. Any person who drove such a vehicle immediately became a suspect.

Because the vehicle that had been assigned to appellant on the night of January 5th fit such a description, appellant also became a subject of the investigation.

On September 29, 1977, appellant voluntarily and willingly took a polygraph examination, the details of which are not reflected in the record of appeal. By appellant's own testimony that was given at the "Jackson v. Denno" hearing,[2] see post,

since becoming a law enforcement officer he had become a great believer that a polygraph examination was the ultimate device to use in determining whether a person was telling the truth. His testimony makes it obvious that he gave the appearance to all that he was totally amazed when he learned that he had failed the polygraph examination that he took on September 29, 1977.[3]

Notwithstanding the fact that appellant failed the examination, he was not fired from his employment, but, instead, was suspended with pay by Winebrenner, who was then acting for H.R. Flournoy, the then Sheriff of Wharton County who was on vacation at the time. Winebrenner testified that he told appellant that he "felt it would be in the best interest of all that he be relieved with pay until the sheriff came back, [and that appellant should stay at his residence] until we get this matter straightened out." Appellant was permitted to keep and, presumably, wear his uniform. He was also allowed to keep his badge, pistol, and identification card. Although Winebrenner told appellant to remain at his residence, rather than go on duty while he was suspended, he was never placed under formal arrest or detained or restrained in any formal manner. No charges were filed against him. In summary, while suspended from duty, appellant appears to have been free to do whatever he chose to do except that when he otherwise would have been on duty he was to remain at his residence, which is the usual condition of a police officer being suspended with pay.

After Flournoy returned from his vacation on October 3, 1977, he spoke with appellant. Flournoy suggested, possibly because he was aware of appellant's great faith in a polygraph examination, that appellant take another polygraph examination. Appellant agreed to take another test. Arrangements were thereafter made to have a private polygraph operator in Austin give appellant another examination.

---

2. So named after the Supreme Court decision of *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

3. Whether any other person also took a polygraph examination is not reflected by the record.

Unknown to appellant at this time, however, the vehicle that had been assigned to him on the night in question had been carefully combed for evidence. A bloody tampax, which was not introduced into evidence, had been seized from inside of the vehicle. A shotgun which contained a shotgun shell that contained 00 buckshot was also seized. 00 buckshot had been found at the location where the remains of Kaiser's body were found. The shot were turned over to Dr. Joseph A. Jachimczyk, a pathologist, who examined Kaiser's skeletal remains on September 7th. From his examination of Kaiser's remains, Jachimczyk formed the opinion that Kaiser's death was caused by a shotgun wound to the head caused by 00 buckshot. The above, together with the fact that appellant had failed the polygraph test, made appellant a prime suspect as being the murderer of Kaiser.

Weathers and Winebrenner drove to appellant's residence in a police vehicle early in the morning of October 6th to pick up appellant and take him to Austin to take the second polygraph examination. At that time, appellant was wearing his uniform. For reasons not shown by the record, before entering the vehicle, appellant turned over to Winebrenner his pistol which he was then carrying.

Weathers testified that before they left Wharton for Austin he told appellant that he did not have to take the polygraph examination unless he wanted to. As previously observed, appellant very much wanted to take the polygraph examination in order to demonstrate to all that he was telling the truth—that he had nothing to do with Kaiser's death—and that the results of the polygraph examination would support his claim of innocence.

Nothing out of the ordinary occurred during the trip to Austin.

Prior to administering appellant the polygraph examination, in his office which is located in one of Austin's larger buildings, the operator of the polygraph machine gave appellant the *Miranda* warnings.[4] After this, appellant was administered a second polygraph examination, which he

soon failed. Needless to say, appellant apparently was even more shocked than when he failed the first examination. After this occurred, appellant made an oral admission against interest to Weathers and Winebrenner. Later that day, appellant signed a written admission against interest at the Sheriff's Department in Wharton. The written admission was neither offered nor admitted into evidence.

In his oral admission, appellant told Weathers and Winebrenner that based upon the results of the polygraph examinations, "he was convinced that he did in fact stop Diana Kaiser with his patrol car, that he did in fact shoot Diana Kaiser, and that he did in fact place her body under the culvert where she was found."

Appellant testified at the "Jackson v. Denno" hearing that was conducted by the trial judge. He testified that he had been a deputy sheriff for approximately one year but had also worked in the past for the Sheriff's Department as a dispatcher for approximately three to four years. He testified that, as to the first polygraph examination, he "agreed" to take it. Appellant testified that after he was told that he had failed the test, and when he had his conversation with Sheriff Flournoy, the Sheriff "suggested [to him] that I go ahead and sign a confession and get it off my chest, [but] I kept telling [Flournoy] that I was not guilty; I still am not guilty." Appellant also testified that Sheriff Flournoy tried to make him feel like he was responsible for ruining "their reputation [apparently referring to law enforcement personnel in general] in Wharton County."

As previously noted, after appellant's conversation with Flournoy, arrangements were made to take appellant to Austin so that he could take another polygraph examination to be administered by a private polygraph operator in that city.

Appellant also testified at the hearing that enroute to Austin Weathers and Winebrenner discussed with him the "incidents" concerning the death of Kaiser. Appellant testified that after he failed the polygraph

4. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

test, the polygraph examiner suggested to him "to go ahead and confess, get it off my chest, and then Ranger Weathers came in and read me the *Miranda* warnings," which appellant testified that he understood what they were. After this had occurred, Weathers "advised [him] to go ahead and get it off [his] chest." Appellant testified that "When they gave me a *Miranda* warning and I flunked the polygraph test, I assumed that I was under arrest." Appellant also testified: "Based on the polygraph examinations and knowing everybody, yes, sir, I felt that I was under arrest at that time."

Interestingly, there is nothing in the record to reflect or indicate that after appellant failed the *first* polygraph examination, he believed that he was then under arrest. In light of the fact that the first polygraph examination was administered by a Department of Public Safety polygraph examiner, we believe it is safe to assume that that person gave appellant the *Miranda* warnings before he administered the examination.

Appellant also testified that he did not ask for an attorney, "[b]ecause I felt like that I was innocent of any wrongdoings. The only thing I felt guilty about was flunking the polygraph test."

Thereafter, the parties drove to La Grange where they stopped and ate at the Cottonwood Inn.

Appellant testified that enroute to La Grange Winebrenner and Weathers discussed Kaiser's death with him. Appellant testified that he believed they did so in order to induce him to give them a written confession.

We pause to point out that the record does not reflect appellant's knowledge of the law of confessions. It is thus perhaps possible that appellant believed that his oral admission against interest that he had earlier made in the private polygraph operator's office was inadmissible evidence.

As to the written statement that he signed in Wharton later that day, appellant testified that the reason he signed the statement was because "I was under a mental strain and I was basing that strictly

on the polygraph examination." It is also possible that because of the way that it was phrased, appellant believed that the written statement would not be admissible evidence in a court of law.

Appellant admitted that he was neither mistreated nor placed under any form of restraint by either Weathers or Winebrenner during the trip back to Wharton.

A careful reading of the record makes it obvious to us that what actually motivated appellant to first give the oral and later the written admission against interest was his frustration at having failed the polygraph examinations. Appellant testified: "I believed in the polygraph test, being a law officer, and I knew in my own mind that I hadn't killed anybody ... I was kind of brainwashed to the polygraph examination."

Weathers also testified at the "Jackson v. Denno" hearing. He testified that after the parties returned to Wharton from Austin he again gave appellant the *Miranda* warnings, after which appellant gave Weathers an oral admission against interest, which appears to have been in all things identical to what he had previously told Weathers and Winebrenner in Austin. Weathers reduced the oral statement to writing. After appellant wrote the following in his own handwriting, "I have read this and believe to the best of my knowledge to be true," he signed the written statement. As previously pointed out, the written statement was neither offered nor admitted into evidence before the jury.

Weathers further testified that after appellant failed the second polygraph examination, he, appellant, told Weathers that "he knew he was going to be arrested and he said, 'I guess I am under arrest now,'" to which Weathers responded: "[You are] not under arrest and that before [you] would be arrested or before [you] could be interrogated there would have to be a complaint filed and a warrant issued, and of course, that hadn't been done." Weathers testified that he nevertheless gave appellant the *Miranda* warnings at that time. Thereafter, appellant gave to Weathers and

Winebrenner his oral admission against interest.

Winebrenner also testified at the "Jackson v. Denno" hearing. Because we find that his testimony is merely cumulative to the above, we will not elongate this opinion by setting out his testimony.

The trial judge entered written findings of fact, which are as follows:

1. That at the time the defendant made the oral statement he was not under arrest and was not a product of interrogation, custodial or otherwise.

2. That at the time the defendant made the oral statement he was a Deputy Sheriff for Wharton County, Texas, and an experienced police officer; that Ranger Weathers and Deputy Winebrenner were friends of the defendant; and that the defendant initiated the conversation.

3. That the defendant gave the oral statement at 1:30 p.m. on October 6, 1977; that defendant was arrested at 9:00 p.m. on October 6, 1977.

4. That although defendant was not under arrest he was given the *Miranda* warning twice before he made the oral statement; that defendant, being a police officer, fully understood his rights.

5. That the oral statement was not obtained by coercive custodial interrogation.

6. That the defendant at the time of the oral statement was mentally competent and aware of what he was doing and willingly initiated the conversation with Ranger Weathers and Deputy Winebrenner.

We find that the record discloses ample evidence to support the trial court's findings and conclusions that appellant's oral admission against interest was voluntarily made while the investigation was in the investigatory stage before reaching its accusatory phase, and during a time when the appellant was not in custody. Therefore, the trial court properly admitted the oral admission against interest into evidence.

We are unaware of any rule of law which forbids lawfully constituted officers of the law from requesting persons to accompany them, or of providing transportation to the police station or some other relevant place in furtherance of an investigation of a crime. Nor are we aware of any rule of law that prohibits police officers from voluntarily taking a person to the police station or some other relevant place in an effort to exonerate such person from complicity in an alleged crime. Nor are we aware of any rule of law which forbids one to reject such request. If the circumstances show that the transportee is acting only upon the invitation, request, or even urging of the police, and there are no threats, express or implied, that he will be taken forcibly, the accompaniment is voluntary, and such person is not then in custody. In other words, under those circumstances, such person has not "been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, supra.

In this instance, because appellant was aware that he had failed the first polygraph examination, we must assume that he realized that he was then a suspect in the death of Kaiser. And yet, knowing this, the record reveals that he not only voluntarily, but did so willingly, almost to the point of insistence, got into a police car that took him to Austin to take another polygraph examination; this time not to be conducted by another law enforcement official, such as the one who had conducted the first one, but, instead, for reasons not reflected by this record, by a private polygraph operator. It is without cavil that appellant wanted to take another polygraph examination in order to demonstrate to the world that he had nothing to do with Kaiser's death. The fact that the police may have assisted him in getting to Austin is in this instance of little moment. We believe that it can be safely assumed that appellant was aware of the many private polygraph operators that exist throughout this State. He was free to make his own arrangements to take such an examination, and could have done so without law enforcement personnel ever being aware of

the results. Nevertheless, he voluntarily and willingly chose to take the route that he took, and to be driven on that route to Austin by fellow members of his profession.

We hold that, at least until after appellant took and failed the second polygraph test, he was not then in custody.

Just exactly when a person may be said to be in custody is not always easily determined. What constitutes "custody" is a question many courts of this Nation have wrestled with since *Miranda v. Arizona,* supra, was decided by the Supreme Court. See generally, Sobel, *The New Confession Standards "Miranda v. Arizona";* Also see "What is 'Custodial Interrogation?': California's Anticipatory Application of Miranda v. Arizona," 14 *U.C.L.A. Rev.* 59 (1966).[5]

Notwithstanding the fact that it has been almost twenty years since *Miranda v. Arizona,* supra, was decided, the question still perplexes courts which seek to lay down consistent, coherent body of rules that the police can predictably work under in performing their job. But, no court has yet to formulate a rule or rules that are workable in all given situations. Therefore, such determination must be made on an ad hoc basis.

■ Generally speaking, custody comes in various and sundry forms. It can result from actual custody in the form of arrest; it can occur if a suspect is physically deprived of his freedom of action in any significant way, such as being placed in a police vehicle and taken to the station house for questioning; it can occur if a person is led to believe, as a reasonable person, that he is deprived of his freedom of movement, such as when a police officer tells him he cannot leave; it can occur if the police create a situation that would warrant a reasonable person in believing that his freedom of movement has been significantly restricted; or it can occur if there is probable cause to arrest and the police do not tell the suspect that he is free to leave. *Oregon v. Mathiason,* supra;

*Beckwith v. United States,* supra; *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Miranda v. Arizona,* supra; *Escobedo v. Illinois,* supra; *Ruth v. State,* 645 S.W.2d 432 (Tex.Cr.App.1979); *Mc Crory v. State,* 643 S.W.2d 725 (Tex.Cr.App.1982); *Ragan v. State,* 642 S.W.2d 489 (Tex.Cr.App.1982); *Gonzales v. State,* 581 S.W.2d 690 (Tex.Cr.App.1979); *Newberry v. State,* 552 S.W.2d 457 (Tex.Cr.App.1977); *Ancira v. State,* 516 S.W.2d 924 (Tex.Cr.App.1974).

Notwithstanding the inability of the courts of this Nation to develop a "Hornbook rule of law," that would always decide when a person is in custody, they have used several different factors in determining whether an interrogation situation is custodial in nature. These are the subjective intent of the police, the probable cause to arrest, the subjective belief of the defendant, and the focus of the investigation. *United States v. Warren,* 578 F.2d 1058 (5th Cir.1978) (En Banc), cert. denied, 446 U.S. 956, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980). Also see *Randall v. Estelle,* 492 F.2d 118, 120 (5th Cir.1974); *United States v. Jonas,* 639 F.2d 200, 203–205 (5th Cir.1981); *United States v. Roberson,* 650 F.2d 84 (5th Cir.1981); *United States v. Wasler,* 670 F.2d 539 (5th Cir.1982). This, of course, is intermingling the focus concept that some courts use with the subjective concept that other courts use, i.e., a blending of the two to reach the ultimate result is used.

In this instance, there was subjective belief by the police officers that appellant was implicated in causing the death of Kaiser. However, there was also subjective belief on the part of appellant that he was aware of their suspicions. When appellant set foot inside of the police car to make the journey to Austin, even taking into consideration that appellant was unaware of the evidence that the police then had, there was no probable cause to arrest him at that time. With or without the evidence that appellant was unaware the police then had, all that the police then had was mere suspicion that appellant had something to do

5. Also see *Mc Crory v. State,* supra, at 733.

with causing the death of Kaiser. And, as an experienced police officer, from the known evidence, appellant either knew or should have been aware of this lack of probable cause to arrest him by the police.

■ Where a person voluntarily accompanies police officers, who are then only in the process of investigating a crime, to a certain location, and he knows or should know that the police officers suspect he may have committed or may be implicated in committing the crime, we are unable to hold that under those circumstances such a person is restrained of his freedom of movement. Under those circumstances, he is not in custody. *Ruth v. State*, supra; *Mc Crory v. State*, supra; *Ragan v. State*, supra; *Stewart v. State*, 587 S.W.2d 148 (Tex.Cr.App.1979); *Stone v. State*, 583 S.W.2d 410 (Tex.Cr.App.1979); *Gonzales v. State*, supra; *Brooks v. State*, 580 S.W.2d 825 (Tex.Cr.App.1979); *Scott v. State*, 571 S.W.2d 893 (Tex.Cr.App.1978); *Newberry v. State*, supra; *Lovel v. State*, 538 S.W.2d 630 (Tex.Cr.App.1976); *Allen v. State*, 536 S.W.2d 364 (Tex.Cr.App.1976); *Bailey v. State*, 532 S.W.2d 316 (Tex.Cr.App.1975); *Adami v. State*, 524 S.W.2d 693 (Tex.Cr. App.1975); *Ancira v. State*, supra; *Graham v. State*, 486 S.W.2d 92 (Tex.Cr.App. 1972); *Evans v. State*, 480 S.W.2d 387 (Tex.Cr.App.1972); *Brown v. State*, 475 S.W.2d 938 (Tex.Cr.App.1971); *Higgins v. State*, 473 S.W.2d 493 (Tex.Cr.App.1971); *Calhoun v. State*, 466 S.W.2d 304 (Tex.Cr. App.1971); *Tilley v. State*, 462 S.W.2d 594 (Tex.Cr.App.1971); *Hoover v. State*, 449 S.W.2d 60 (Tex.Cr.App.1969); *Bell v. State*, 442 S.W.2d 716 (Tex.Cr.App.1969).

The record in this cause makes it abundantly clear that at least until after appellant had failed the second polygraph examination that he took in Austin he was not in the legal custody of Weathers or Winebrenner, and we so hold.

Did appellant's failure to pass the polygraph examination cause him to be in custody? Did his subjective belief that he was then under arrest cause him to be in custody? We will answer these questions in the negative.

The record reflects that after appellant failed the polygraph test in Austin, he was again given the *Miranda* warnings. As before, after he failed the first polygraph examination, appellant either knew or should have known that he was a suspect in the death of Kaiser; probably more so this time due to having failed a polygraph examination a second time.

■ Even though he had failed both tests, appellant, as an experienced police officer, either knew or should have known that the results of the tests were not admissible evidence against him in a court of law. It has long been the consistent holding of this Court, which we believe is taught to law enforcement officers throughout this State, that evidence of the results of a polygraph examination is not admissible evidence on behalf of either the State or the accused. *Robinson v. State*, 550 S.W.2d 54 (Tex.Cr.App.1977). Also see the many, many cases collated under West Criminal Law Key 388.

■ Notwithstanding this law, but soon thereafter, appellant gave Weathers and Winebrenner his oral admission against interest.

Given the above circumstances and facts of this case, we believe that in this instance it is custody, rather than focus, which is all important. If appellant was then in custody, his oral admission against interest was inadmissible evidence; if not, such was admissible evidence.

We find that this case has a lot of similarities to this Court's decision of *Stone v. State*, supra, in which this Court held that the defendant was not in custody, even after he had failed a polygraph examination. There, the defendant was a suspect who voluntarily spoke with police officers after failing a polygraph examination. Contrary to here, the defendant there was told that he would probably be charged. However, as here, the defendant was not placed under arrest, was not told that he was under arrest nor was he told that he was not free to leave. This Court held that the defendant was not then under arrest or in custody.

Just as the defendant Stone was not in custody, given the facts and circumstances of this cause, we hold that the appellant was not in custody after he failed the polygraph examination and before he made his oral admission against interest. In fact, given the facts and circumstances of this cause, we are able to unequivocally hold that until appellant signed his written statement back in Wharton he was not in custody.

■ We have described appellant's oral statement that was made to Weathers and Winebrenner as an admission against interest. We did so because in the context of his oral statement that he made to Weathers and Winebrenner appellant did not make an outright admission of facts indicating his guilt of killing Kaiser, but was merely stating a conclusion based upon the fact that he had failed two polygraph examinations. This distinguishes this case from *Mc Crory v. State*, supra, in which the defendant made an unqualified admission of guilt, after he failed a polygraph examination, and the officers testified that after the defendant made such admission one of them would probably have arrested the defendant had he tried to leave.

Appellant has never seriously contended that he did not freely, voluntarily, and without compulsion or persuasion make the oral admission against interest to Weathers and Winebrenner. The fact that he later expressed at the "Jackson v. Denno" hearing the subjective belief that he believed that he was under arrest after he failed the polygraph examination is only a factor worth considering, which, in this instance, the trial judge resolved against him.

Given the unusual and peculiar circumstances of this case, we hold that the appellant was not in custody when he made his oral admission against interest to Weathers and Winebrenner. Appellant's oral statement was admissible evidence pursuant to Art. 38.22, supra.

The judgment of the court of appeals is affirmed.

TOM G. DAVIS, J., not participating.

CLINTON, Judge, dissenting.

Professor Ray writes: "The phrase 'admission against interest' ... tends to cause the courts and some writers to assume that the basis of admissions is the same as that of declarations against interest. In fact, they are quite different." Ray, Law of Evidence (3rd Ed.) § 1122, 1A Texas Practice 271.

The opinion of the Court of Appeals says: "According to the officers' version, Shiflet *related the facts* that he shot Mrs. Kaiser and hid her body ..." 653 S.W.2d 830, at 834 (my emphasis here and throughout). However, elsewhere the Court of Appeals and the majority has the appellant stating that "he was *convinced* that he did in fact stop Diana Kaiser with his patrol car, that he did in fact shoot Diana Kaiser, and that he did in fact place her body under the culvert where she was found," *id.*, at 833; majority opinion, at 626. That is the primary statement in question.

Unlike an admission, for a declaration against interest to be admissible it must be shown that the declarant has "knowledge of the facts stated," *Ray*, op cit. § 1009, at 262. As I understand it, throughout appellant denied knowledge of those facts, his position being that what he stated was based on his failing to pass one or more polygraph examinations. All seem to accept his attitude. That he became "convinced" on such basis does not mean he really had "knowledge" of those facts. His declaration is of nothing more than his mental state of belief at that time. Under Texas Rules of Evidence, Rule 803(24), the statement *might* be admissible, but not otherwise. [Being a declaration of his mental state of belief, it is not a declaration of state of mind and is not admissible "as evidence of the truth of the external situation believed ...," *Ray*, op cit. § 863, at 96; Texas Rule 803(3)].

An admission, in contrast to a declaration against interest, is a statement amounting to "a prior acknowledgment by such party that one of *the facts relevant to the issues* is not as he now claims," *Ray*, § 1121, at 265–266; cf. Texas Rule 801(e)(2). Again, unless he did so by pleading not guilty, it

seems to me that appellant would have to claim at trial that he was *not* now "convinced" by reason of having failed the polygraph examinations that he had stopped Kaiser et cetera.

In the event, as a declaration of belief it is most doubtful that the statement was admissible at all, simply because of what appellant had been "convinced" seems utterly irrelevant to any material issue in the case.

I respectfully dissent.