In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-05-00067-CR
______________________________


CALVIN Q. YARBOROUGH, Appellant
 
V.
 
THE STATE OF TEXAS, Appellee


                                              

On Appeal from the 71st Judicial District Court
Harrison County, Texas
Trial Court No. 04-0208X


                                                 



Before Morriss, C.J., Ross and Carter, JJ.
Opinion by Justice Ross


O P I N I O N

          Calvin Q. Yarborough was indicted on charges of aggravated assault in connection
with the beating and stabbing of his mother-in-law. A Harrison County jury returned a guilty
verdict and assessed punishment at thirteen years' imprisonment. The trial court imposed
sentence in accordance with the jury's verdict. Yarborough appeals, contending the trial
court erred by admitting his videotaped statement and by denying his motion for directed
verdict. He also contends the jury's rejection of his assertion of self-defense is against the
great weight and preponderance of the evidence. Because we conclude that his statement
was not a product of custodial interrogation and that the evidence is legally and factually
sufficient to support the jury's verdict, we affirm the judgment.
I. Factual and Procedural History
          A. At the Apartment
          The State's evidence showed that Yarborough and Lori Hamm had a daughter
together in March 2001, and married the following January. Their marriage was marked
by violence, resulting in repeated separations. In April 2003, Lori obtained a protective
order against Yarborough. Even then, however, Lori permitted Yarborough to stay at her
apartment in Marshall from time to time. On May 14, 2004, Lori took completed divorce
papers to the legal aid office in Longview. Her three-year-old daughter, Lauren, was with
her. After going to the legal aid office, Lori then did some shopping with her friend,
Michelle Brightman, who lived in Longview. After shopping, they returned to Brightman's
house, where Yarborough appeared unexpectedly. After visiting with Lori and Lauren for
a few minutes, Yarborough left and then Lori and Lauren left. On their way back to
Marshall, Lori stopped at a store and called her mother, Linda Wilson, to tell her she was
on her way home. As Lori was driving into the parking lot to her apartment, she saw
Yarborough driving out. Yarborough flagged her down and told her he wanted to talk to
her about "some legal stuff." After assuring the hesitant Lori that he just wanted to talk,
Yarborough assisted in taking their child out of Lori's car and went with Lori to her
apartment. Lori testified she told Yarborough to remain outside the door while she put their
daughter to bed. However, as Lori entered her apartment, Yarborough pushed his way
inside. Yarborough again assured Lori that he had no intentions of hurting her and closed
the door. Lori insisted that he leave, but Yarborough sat down on the couch and began
trying to persuade Lori to drop the protective order against him. 
          Lori testified she was to call her mother when she arrived back at her apartment, but
she did not do so because she did not want Yarborough to know she had a cell phone. 
Wilson became concerned that Lori had not called, so she went to Lori's apartment. 
According to Lori, both she and her mother asked Yarborough again to leave the
apartment. As Yarborough was moving toward the door, as though he were leaving, he
continued a conversation with Wilson. He then stated he wanted to hug and kiss his
daughter before he left. He did so, and Wilson then took the child from him. According to
Lori, Yarborough opened the door, but then closed and locked it, stating, "nobody is
leaving out of her [sic]." At this point, both Lori and Yarborough were near the door and
Wilson was holding her granddaughter in or near the dining area and away from the door. 
          Yarborough began to assault Lori, beating her with his fists. Wilson, while still
holding her grandchild and still located near the dining area, attempted to call the police
from her cell phone. Yarborough intervened, knocked the phone away from Wilson, and
began to strike Wilson while she still held the child. 
          Lori then began to attack Yarborough in defense of her mother. At first, Lori hit
Yarborough with her fists, but stated that doing so had little effect on Yarborough's assault
of Wilson and, indirectly, their child. Lori then took a pocketknife from her pocket and
stabbed Yarborough three times. Lori explained that Yarborough took the knife from her,
stabbed her, moved toward Wilson, and also stabbed her. Lori testified that, following the
multiple stab wounds, Wilson fell to the floor and Yarborough then returned to the also
fallen Lori to kick and stomp her. Yarborough then returned to Wilson in the dining area
and kicked her. Lori attempted to get up and get out the door, but Yarborough returned
and stabbed her again. Lori was stabbed a total of fifteen times. She testified she
believed she had to use the knife to protect her mother from Yarborough. Lori admitted
she stabbed Yarborough first. 
          Wilson's testimony confirmed much of Lori's version of the events. Wilson explained
that, when Yarborough began assaulting Lori, she (Wilson) tried to call for help on her cell
phone, but Yarborough then struck her in the face as she still held her grandchild. She
testified Yarborough then stabbed her four times, beat her in the face, and kicked and
stomped her numerous times. The assault resulted in a nearly-detached retina, stab
wounds, and several bruises all over her body. Yarborough pointed out an inconsistency
between the version of events Wilson stated during her first interview at the hospital and
her testimony at trial regarding when she realized the altercation between Lori and
Yarborough had drawn blood. 
          Yarborough's statement, videotaped at the hospital on the evening of these events,
was published to the jury. Yarborough told the police that everything had been fine that
evening until his mother-in-law arrived. He stated he was never asked to leave the
apartment. He explained that he "asked" Wilson about the possibility that her husband had
been sexually molesting Yarborough's daughter


 and that Wilson did not like that
conversation. As Yarborough prepared to leave, he hugged his daughter and was in the
process of handing her over to Wilson when Lori stabbed him in the shoulder. He then
explained that, on realizing he had been stabbed, he pushed his daughter and Wilson
aside and was stabbed again while doing so. He took the knife away from Lori and just
started swinging. He said he did not know who was stabbed or how many times anyone
was stabbed, only that "everybody got stabbed." 
          In response to questions by the police, he further stated he felt in fear of his life
when Lori stabbed him and he saw blood. He stated he was just "trying to get out that
door" because he thought Lori had stabbed him in the heart. He kept swinging his fists and
the knife until he was able to open the door. He further stated that he had been to Wilson's
house earlier that day and that they "had no problem." According to Yarborough's account,
there had been no altercation before the point in time at which Lori stabbed him.
          Yarborough left and drove himself to the hospital. Lori went to a neighbor's
apartment to summon help. All three—Yarborough, Lori, and Wilson—were hospitalized
for their wounds.
          B. At the Hospital
          Lieutenant Doyle Kuhn and Sergeant Darryl Griffin, detectives for the Marshall
Police Department, interviewed Wilson, Lori, and Yarborough at the hospital that night. No
arrests were made because, according to Griffin, the statements given by the persons
involved were inconsistent and possibly unreliable because of the severity of their wounds
and the nature of their medical treatment. All three—Yarborough, Lori, and
Wilson—remained at the hospital that night. After the follow-up interviews with Lori and
Wilson a few days later, Griffin sought a warrant for Yarborough's arrest. Yarborough was
arrested in Longview five days after the incident. 
          C. At Trial
          Yarborough was charged with the aggravated assault of Wilson. During the trial,
the State sought to admit Wilson's videotaped statement. Yarborough objected to its
admissibility on the basis he had not been warned in compliance with Article 38.22 of the
Texas Code of Criminal Procedure. The trial court determined that the statement was not
made as a product of custodial interrogation and that, therefore, the statement was
admissible regardless of compliance with Article 38.22. At the close of the State's
evidence, Yarborough unsuccessfully moved for a directed verdict, arguing that the State's
evidence conclusively established that Yarborough acted in self-defense. 
II. Admission of Yarborough's Videotaped Statement
          A. Article 38.22 Requirements
          Article 38.22 of the Code of Criminal Procedure sets out the conditions to be met
before the state may use a suspect's oral statement against him or her: 
No oral . . . statement of an accused made as a result of custodial
interrogation shall be admissible against the accused in a criminal
proceeding unless:
 
(1) an electronic recording . . . is made of the statement;
 
(2) prior to the statement but during the recording the accused is given
the warning in Subsection (a) of Section 2 above


 and the accused
knowingly, intelligently, and voluntarily waives any rights set out in the
warning;
 
(3) the recording device was capable of making an accurate recording,
the operator was competent, and the recording is accurate and has not been
altered;
 
(4) all voices on the recording are identified; and
 
(5) not later than the 20th day before the date of the proceeding, the
attorney representing the defendant is provided with a true, complete, and
accurate copy of all recordings of the defendant made under this article.

Tex. Code Crim. Proc. Ann. art. 38.22, § 3(a) (Vernon 2005). By its own language, Article
38.22 does not apply to noncustodial statements: "Nothing in this article precludes the
admission . . . of a statement that does not stem from custodial interrogation, . . . ." Tex.
Code Crim. Proc. Ann. art. 38.22, § 5 (Vernon 2005). 
          B. Issue of Custodial Interrogation
          A person is in custody only if, under the circumstances, a reasonable person would
believe that his or her freedom of movement was restrained to the degree associated with
a formal arrest. Stansbury v. California, 511 U.S. 318, 322 (1994); Dowthitt v. State, 931
S.W.2d 244, 254 (Tex. Crim. App. 1996). Texas courts look at four factors when
determining whether a person is in custody: 1) probable cause to arrest, 2) subjective
intent of the police, 3) focus of the investigation, and 4) subjective belief of the defendant. 
Dowthitt, 931 S.W.2d at 254. The Texas Court of Criminal Appeals has described at least
four of the "various and sundry forms" of custody other than formal arrest. See Shiflet v.
State, 732 S.W.2d 622, 629 (Tex. Crim. App. 1985). Custody can occur when 1) "a
suspect is physically deprived of his freedom of action in any significant way, such as being
placed in a police vehicle and taken to the station house for questioning," 2) "a person is
led to believe, as a reasonable person, that he is deprived of his freedom of movement,
such as when a police officer tells him he cannot leave," 3) "if the police create a situation
that would warrant a reasonable person in believing that his freedom of movement has
been significantly restricted," or 4) "if there is probable cause to arrest and the police do
not tell the suspect that he is free to leave." Id. 
          C. Standard of Review
          Generally, we review the trial court's admission of evidence for an abuse of
discretion. See Montgomery v. State, 810 S.W.2d 372, 378 (Tex. Crim. App. 1990). We
afford almost total deference to a trial court's determination of historical facts, especially
when the trial court's fact-findings are based on an evaluation of credibility and demeanor. 
See Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997); State v. Oliver, 29
S.W.3d 190, 191 (Tex. App.—San Antonio 2000, pet. ref'd). Similarly, we afford great
deference to the trial court's rulings on application of law to fact questions when resolution
of those ultimate questions turns on an evaluation of credibility and demeanor. See
Guzman, 955 S.W.2d at 89. However, we review de novo mixed questions of law and fact
not falling within this category. See id. Because the facts surrounding Yarborough's
recorded statement are not in dispute, the matter at issue here is whether Article 38.22
applies to Yarborough's videotaped statement, a question of law. We therefore apply
de novo review. See id.; Oliver, 29 S.W.3d at 191.
          D. Statement Was Not Made As a Result of Custodial Interrogation
          Kuhn testified that, in interviewing Yarborough at the hospital that night, he did not
do anything different from what he did in interviewing Lori and her mother. Griffin's
testimony reveals that the preliminary interviews yielded inconsistent stories, calling for
further investigation. Further, the context of the interview with Yarborough would not lead
a reasonable person to believe that his or her movement was restrained. In response to
the detectives' questions, Yarborough recalled his version of the day's events. He also
explained his concerns regarding the possibility that his daughter was being sexually
molested. The officers said nothing that would indicate Yarborough was under arrest. 
Yarborough's movement was restrained only to the extent that he was receiving medical
treatment for his stab wounds. There were no threats or statements of coercion. The
detectives asked at least twice if Yarborough had gone into "a rage" or "just lost it," and
allowed Yarborough to respond and clarify. While the detectives expressed their concern
over the number of times Lori was stabbed, there is no indication during the interview that
the police had probable cause to arrest Yarborough at that point. In fact, Kuhn indicated
that, at that point in the investigation, all three were suspects. After the twenty-minute
interview, the detectives concluded their questions and left Yarborough in the hospital's
care. It was not until after follow-up interviews with Lori and Wilson a few days after the
incident that Griffin sought an arrest warrant for Yarborough. Yarborough was arrested in
Longview five days after the hospital interview. 
          Nothing in the interview or in the record suggests that Yarborough's statement was
made in response to custodial interrogation. Therefore, the mandates of Article 38.22 are
not applicable. We overrule Yarborough's first point of error. 
III. Sufficiency of Evidence
          In one multifarious point of error, Yarborough complains of the trial court's denial of
his motion for directed verdict and of the jury's implicit rejection of his theory of self-defense. We read this point of error to challenge the legal and factual sufficiency of the
evidence.
          A. Aggravated Assault
          A person commits aggravated assault if the person commits assault as defined in
Tex. Pen. Code Ann. § 22.01


 and the person: (1) causes serious bodily injury to another,
including the person's spouse; or (2) uses or exhibits a deadly weapon during the
commission of the assault. Tex. Pen. Code Ann. § 22.02 (Vernon Supp. 2005). 
          B. Self-Defense Standards and Burdens
          To properly focus our review of the evidence, we look to well-established rules
concerning the availability and extent of deadly force in self-defense.
                     1. Use of Force
          A person is justified in using force against another when and to the degree he or she
reasonably believes the force is immediately necessary to protect himself or herself against
the other's use or attempted use of unlawful force. Tex. Pen. Code Ann. § 9.31(a) (Vernon
2003); see Frank v. State, 688 S.W.2d 863, 868 (Tex. Crim. App. 1985). One has the right
to defend against a reasonable appearance and apprehension of apparent danger to the
same extent as against actual danger. Dyson v. State, 672 S.W.2d 460, 463 (Tex. Crim.
App. 1984). 
                     2. Deadly Force
          Additional requirements apply to the use of deadly force. See Tex. Pen. Code Ann.
§ 9.31(d) (Vernon 2003). A person is justified in using deadly force against another if the
following requirements are satisfied:
(1) if he would be justified in using force against the other under
Section 9.31;
 
(2) if a reasonable person in the actor's situation would not have
retreated; and
 
(3) when and to the degree he reasonably believes the deadly force
is immediately necessary:
 
(A) to protect himself against the other's use or attempted use
of unlawful deadly force; or
 
(B) to prevent the other's imminent commission of aggravated
kidnapping, murder, sexual assault, aggravated sexual assault,
robbery, or aggravated robbery.

Tex. Pen. Code Ann. § 9.32(a) (Vernon 2003). From this, we point out that use of deadly
force is justified only when retreat is unreasonable.


 See Frank, 688 S.W.2d at 868. The
test is whether a reasonable person in the actor's situation would have retreated. Id.
                     3. Burdens of Production and Persuasion
          The issue of self-defense is one of fact to be determined by the jury. See Saxton
v. State, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991). Yarborough had the burden to
prove by a preponderance of the evidence that he acted in self-defense. See Tex. Pen.
Code Ann. § 2.04(d) (Vernon 2003). Once a defendant raises the issue of self-defense,
the state then carries the burden to persuade the jury, beyond a reasonable doubt, that the
claim of self-defense is not true. The state need not specifically disprove the issue of self-defense. Rather, the burden is incorporated into the state's burden to prove its case. See
Saxton, 804 S.W.2d at 913. A jury verdict of guilty is an implicit finding rejecting the
defendant's self-defense theory. Id. at 914.
          C. Legal Sufficiency of the Evidence 
                     1. Standard of Review
          A challenge on appeal to the denial of a motion for directed verdict is a challenge
to the legal sufficiency of the evidence. See Canales v. State, 98 S.W.3d 690, 693 (Tex.
Crim. App.), cert. denied, 540 U.S. 1051 (2003). In reviewing the legal sufficiency of the
evidence to support a conviction, we view all the evidence in the light most favorable to the
judgment where the jury is the trier of fact. Cardenas v. State, 30 S.W.3d 384, 389–90
(Tex. Crim. App. 2000). The critical inquiry is whether, after so viewing the evidence, any
rational trier of fact could have found the essential elements of the crime beyond a
reasonable doubt. See Saxton, 804 S.W.2d at 914.
                     2. Evidence was Legally Sufficient To Support Jury's Verdict
          Viewing the evidence in a light most favorable to the verdict, we conclude that the
record demonstrates the State's evidence was legally sufficient to prove beyond a
reasonable doubt each element of aggravated assault against Wilson. Wilson testified
Yarborough stabbed her four times with a knife. Griffin testified that he examined the knife
and that it was capable of causing serious bodily injury or death. Based on such evidence,
the jury could have concluded Yarborough committed aggravated assault against Wilson.
          Contrary to Yarborough's contention, this evidence did not establish he was
reasonable in believing that use of force was necessary to protect himself from Wilson. 
Additionally, Yarborough presented no evidence Wilson threatened him with any amount
of force. In his videotaped statement at the hospital, Yarborough explained twice that
Wilson had been "standing off to the side" when he leaned toward Wilson to let her have
the child when Lori stabbed him. We conclude that the evidence was legally sufficient to
support the jury's implicit rejection of Yarborough's theory of self-defense. 
          D. Factual Sufficiency of the Evidence
                     1. Standard of Review
          Yarborough also argues that the jury's rejection of his assertion of self-defense was
against "the great weight and preponderance of the evidence." When a defendant
challenges the factual sufficiency of the rejection of a defense, the reviewing court reviews
all of the evidence in a neutral light, and we will set the verdict aside only if the evidence
is so weak that the verdict is clearly wrong and manifestly unjust, or the contrary evidence
is so strong that the standard of proof beyond a reasonable doubt could not have been
met. See Zuniga v. State, 144 S.W.3d 477, 484 (Tex. Crim. App. 2004); see also Zuliani
v. State, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003) (specifically outlining the factual
sufficiency standard concerning jury's rejection of self-defense). 
                     2. Factually Sufficient Evidence To Support Rejection of Self–Defense
          In Yarborough's videotaped statement, he stated he grew afraid for his life when Lori
stabbed him and, believing he had been stabbed in the heart, he just started swinging the
knife in an attempt to escape the assault and the apartment. 
          Of course, the jury was free to accept or reject any or all of Yarborough's evidence. 
See Saxton, 804 S.W.2d at 913. We also emphasize that Yarborough was charged with
the aggravated assault of Wilson, not Lori.


 So, based on the evidence before it, the jury
could have concluded that it was not reasonable for Yarborough to believe that use of force
was immediately necessary to defend himself from Wilson. The record shows that only
Lori stabbed Yarborough and that, even by Yarborough's own account, Wilson stood "off
to the side." The record quite clearly shows that Wilson did not act in a threatening way
toward Yarborough. 
          The record shows that Wilson was holding the child while standing in the opposite
direction from the door. Yarborough had to move away from the door in order to attack
Wilson. For the jury to accept Yarborough's theory of self-defense, it would have to
conclude he reasonably believed it was immediately necessary to use force to protect
himself against Wilson's use or attempted use of unlawful force. See Tex. Pen. Code Ann.
§ 9.31(a). The facts that Wilson was holding the child, had no weapon, made no verbal
threats, made no physical gestures toward Yarborough, and posed no obstacle to the door
directly contradict Yarborough's depiction that Wilson was injured when he started swinging
the knife in fear for his life and in an effort to get out of the apartment. 
          Further, even if Yarborough could have reasonably believed that Wilson was
threatening him with deadly force, he is unable to bring forth evidence he could not have
retreated. In fact, the record reveals that Wilson was in the opposite direction of the door. 
So, the jury had before it sufficient evidence to conclude it was unreasonable to attack
Wilson with the knife, kick and stomp her, and beat her when he could have retreated. 
From our review of the record, factually sufficient evidence supports the jury's rejection of
Yarborough's theory of self-defense.
          We cannot say the evidence of guilt considered by itself is too weak to support the
finding of guilt beyond a reasonable doubt, or that the contrary evidence—evidence
favoring Yarborough's theory—is strong enough that the State could not satisfy its burden
of proof beyond a reasonable doubt. See Zuniga, 144 S.W.3d at 484. We therefore
conclude that the evidence is both factually and legally sufficient to support the jury's
implied finding against Yarborough on the issue of self-defense. We overrule Yarborough's
second point of error.
IV. Conclusion
          We conclude that Yarborough's statement at the hospital was not a product of
custodial interrogation. Article 38.22, therefore, is inapplicable to his statement. Applying
the appropriate standards of review, we hold that the evidence was both legally and
factually sufficient to support the jury's implicit finding that Yarborough's conduct was not
justified by self-defense. 
 
          Accordingly, we affirm the judgment.


                                                                           Donald R. Ross
                                                                           Justice 

Date Submitted:      October 13, 2005
Date Decided:         November 16, 2005

Publish



ine-height: 0.416667in">          With respect to the first statement, Wenona had been working as an in-court deputy
district clerk, under Wilson's supervision, during a murder trial in which a husband killed
his wife during a domestic dispute. After listening to the evidence in the case, Wenona
began to cry. Wilson said Wenona became "absolutely" overwhelmed with emotion and
very upset during the presentation of evidence. Wilson observed Wenona shaking in
conjunction with her emotional state. In fact, Wenona had to leave the trial three or four
times because "it got too hard for her." When Wenona left the first time, Wilson went with
her, and Wenona confided in Wilson that she was upset because she believed Harris
would kill her. 
          At trial, Harris objected to Wilson's testimony about Wenona saying she feared
being killed by Harris. Harris objected on the basis that the statement's genesis was not
from emotion or undue stress. On appeal, the State contends trial counsel's objection was
insufficient to preserve the issue now raised on appeal by Harris. We disagree. Given
both the context of Wilson's entire testimony and the prosecutor's explicit offering of the
evidence pursuant to the excited utterance exception to the hearsay rule, we believe trial
counsel's objection was sufficiently tailored to provide the trial court with notice of the issue
being raised and was therefore sufficient to preserve it for our review on the basis now
presented on appeal.
          The startling event that triggers an excited utterance need not necessarily be the
crime itself. Hunt v. State, 904 S.W.2d 813, 815–16 (Tex. App.—Fort Worth 1995, pet.
ref'd). In Hunt, a child victim had been sexually assaulted by her father's friend. Three
months later, while watching a television show about a young rape victim, she began to cry
uncontrollably and told her mother what had happened. Id. at 815. The Second Court of
Appeals upheld the trial court's admission of the excited utterance on the basis that "the
shock of seeing the television news program . . . triggered K.S.'s fear of pregnancy and the
ensuing out-of-court statements." Id. at 816. The Hunt court further noted that the
evidence showed the utterance "was made before there was time to misrepresent and that
it [the statement] related to the circumstances of the occurrence preceding it." Id. at
816–17.
          In the case now before us, Wilson testified Wenona was completely overwhelmed
by her emotions as a result of hearing the evidence during the murder trial. Wenona made
the statement to Wilson when they left the courtroom after Wenona first became upset
from observing the testimony in the murder case, and it is clear from Wilson's testimony
that it was watching the events in the courtroom that triggered Wenona's emotional state. 
From the evidence in this case, we believe the trial court could have reasonably concluded
Wenona was not able to reflect or fabricate such a reaction to the testimony and was under
the excitement and stress of the events in the courtroom when she spoke, even though the
events in question occurred several months before the time Wenona made the statements.
Cf. Apolinar v. State, 106 S.W.3d 407, 417–19 (Tex. App.—Houston [1st Dist.] 2003, pet.
granted) (passing of time between assault and excited utterance did not convert statement
into hearsay when evidence showed utterance was made when victim had not had
opportunity to reflect or fabricate). Accordingly, we cannot say the trial court acted outside
the zone of reasonable disagreement in permitting Wilson to testify about Wenona's
statement to her.



          With respect to the second statement, Anderson testified to the following during the
State's case-in-chief:
[Anderson:] I was asking her [Wenona] who she was applying for a
protective active order against and why.
 
[Prosecutor:] And what did she explain to you?
 
[Anderson:] She said she was applying for a protective order to
protect her from her husband, William Harris. I believe she told me she had
filed a divorce action against him and that was pending but not final at that
time. She said that he had committed an act of violence, act of physical
violence against her. She said [that] she was very afraid of him. She said
that in addition to the act of violence he had committed against her that he
had also threatened her, that he had admitted himself to a psychiatric facility
because he was afraid of hurting her, these sort of things.

(Emphasis added.) Anderson then explained that Wenona appeared very upset and cried
during the interview. 
          Nonetheless, the evidence showed Wenona had taken her own initiative in seeking
the protective order from Anderson's office. This shows Wenona had given the matter
some degree of reflection and thought. We cannot say Wenona's statement to Anderson
is inherently trustworthy because it is not clearly the product of "an event speaking through
the person rather than the person speaking about the event." Zuliana, 97 S.W.3d at 595. 
We hold the trial court abused its discretion by admitting the statement under the excited
utterance exception.
          Having found the trial court erred by admitting Anderson's testimony over Harris'
proper hearsay objection, we must determine whether the error was harmful. Tex. R. App.
P. 44.2. The erroneous admission of evidence is nonconstitutional error, for which we
review harm under Rule 44.2(b) of the Texas Rules of Appellate Procedure. We are not
to reverse a criminal conviction unless, after examining the record as a whole, we have fair
assurance that the error did influence the jury or had more than a slight effect. Tex. R.
App. P. 44.2(b); Johnson v. State, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). 
          In this case, Anderson did not testify about the specifics of the assaultive offense
that prompted Wenona to seek a protective order from her office. Another witness,
however, did inform the jury about such specifics. Hampton testified that, over a period of
three years, Harris assaulted Wenona on several occasions. In 1997, Harris threw a
telephone at Wenona. In 1998 or 1999, Harris hit Wenona with a telephone, causing a
black eye. Hampton also recalled a separate occasion when she saw Wenona with
bruises on her neck where Harris had choked her. On appeal, Harris neither contends the
trial court erred by admitting Hampton's testimony, nor did he specifically object to that
evidence at trial. Thus, in light of Hampton's more detailed testimony, we cannot say the
erroneous admission of Anderson's otherwise generic description of the prior assault
influenced the jury's verdict or had more than a slight effect, if any at all. We overrule
Harris' second point of error.
III. Expert Testimony
          In his third point of error, Harris contends the trial court erred by failing to hold a
hearing on the admissibility of expert testimony on the "cycle of domestic violence."


 The State responds that the trial court was not required to permit voir dire under Rule
705(b) of the Texas Rules of Evidence because Anderson did not testify as an expert. 
          A person who is qualified as an expert by knowledge, skill, experience, training, or
education may testify about scientific, technical, or other special knowledge that the trial
court finds will assist the trier of fact in understanding the evidence, or in determining a fact
in issue. Tex. R. Evid. 702.
Prior to the expert giving the expert's opinion or disclosing the underlying
facts or data, a party against whom the opinion is offered upon request in a
criminal case shall, or in a civil case may, be permitted to conduct a voir dire
examination directed to the underlying facts or data upon which the opinion
is based. This examination shall be conducted out of the hearing of the jury.
 
Tex. R. Evid. 705(b) (emphasis added). The rule is clear: if a criminal defendant requests
a hearing under Rule 705(b), the trial court must allow such an examination outside the
jury's presence before the expert gives further testimony in the jury's presence. Tex. R.
Evid. 705(b); Alba v. State, 905 S.W.2d 581, 587–88 (Tex. Crim. App. 1995). By contrast,
the rule regarding voir dire of experts in civil cases is permissive. The trial court errs if it
denies a timely request to voir dire an expert witness in a criminal trial. Alba, 905 S.W.2d
at 588. "In such a case, a reviewing court would then be required to decide whether the
trial judge's error was so harmful as to require reversal." Id.
          In Alba, the prosecution called a psychiatric expert during the punishment phase of
a capital murder trial. After the prosecutor qualified the witness as an expert and asked
a hypothetical question that took up thirteen pages of the reporter's record, the defendant,
for the first time, objected to the expert's testimony and requested a hearing outside the
jury's presence pursuant to Rule 705(b). The trial court denied the request. In reviewing
that denial on appeal, the Texas Court of Criminal Appeals noted, "The focus of Rule
705(b) is to prevent the jury from hearing the underlying facts and data which might
ultimately be ruled as inadmissible." The court then held that the purpose of the Texas
Rules of Evidence had been satisfied by the prosecutor's thirteen-page hypothetical and
by the fact that no improper evidence had been errantly disclosed to the jury. The Alba
court then held that the trial court did not err by denying the defendant's request for a Rule
705(b) hearing. Id. 
          At trial in the case now before us, Anderson explained her background as a
Galveston County assistant criminal district attorney (she heads a department that
prosecutes crimes of domestic violence and obtains protective orders on behalf of victims)
and as a registered nurse who worked for many years in the emergency room. Harris'
counsel then objected to Anderson's testimony. "Your Honor, she keeps going into
domestic violence. She has expert testimony on that. I think I'd like to have a Daubert
hearing to see whether she has scientific basis for that information." The trial court denied
Harris' request. Harris later issued a second objection to the prosecutor's continued
questioning of Anderson's anticipated testimony on the "cycle of violence." "Objection,
Your Honor, the predicate still hadn't been laid, no scientific basis thereof." The trial court
again overruled Harris' objection.
          The trial court permitted Anderson to testify in general terms about a theory that has
more commonly come to be referred to as "the cycle of domestic violence."


 The State
asked Anderson about the "cycle of violence" based on her "training and experience and
backgrounds in the area of domestic violence." It is clear from the record that the
prosecutor sought to demonstrate Anderson possessed specialized knowledge about
domestic violence. Such specialized testimony is the very essence of expert testimony. 
See, e.g., Burns v. Baylor Health Care Sys., No. 08-02-00159-CV, 2003 WL 22161590,
at *2-3 (Tex. App.—El Paso Sept. 19, 2003, no pet.) (analyzing whether proponent of
expert testimony carried burden to provide proof of expert's qualifications). Accordingly,
we do not agree with the State's suggestion on appeal that Anderson was testifying
exclusively as a lay witness.
          At this juncture, none of the data or facts underlying Anderson's testimony about the
"cycle of violence" were before the jury. This distinguishes this case from the situation
presented in Alba. In Alba, the defendant did not object until the "cat was already out of
the bag." Here, the "underlying facts and data which might ultimately be ruled as
inadmissible" were not yet before the jury. See Alba, 905 S.W.2d at 588. There is no
indication in the record Harris knew or could reasonably be expected to know "the
foundation of the expert's opinion." See id. Accordingly, we believe Harris' objection was
timely and the trial court had a mandatory duty to allow a voir dire examination outside the
jury's presence. See Tex. R. Evid. 705(b). The trial court abused its discretion by not
allowing Harris to voir dire Anderson regarding the underlying data or facts that formed the
basis of her testimony as an expert witness. We must now determine whether the error
is "so harmful as to require a reversal." Goss v. State, 826 S.W.2d 162, 168 (Tex. Crim.
App. 1992); see also Alba, 905 S.W.2d at 588 (suggesting in dicta that even had trial court
erred, such error was "clearly harmless"). 
          During the first six pages of her testimony, Anderson described her education, work
experience, and her observations regarding common characteristics exhibited by victims
of domestic violence. On a portion of the following page, she describes the "cycle of
violence" concept. After that, Anderson spends the next twenty-one pages of testimony
explaining how someone obtains a protective order through Anderson's office, and then
tells the jury what Wenona herself had done to apply for a protective order against Harris. 
          It is clear from the record that Anderson's general observations of domestic abuse
victims set a background for her later, more specific testimony, about Wenona going
through the process of obtaining a protective order. That general testimony was relevant
and probative because it aided the jury in understanding the process for obtaining such an
order. Cf. Scugoza, 949 S.W.2d at 363 (witness' "cycle of violence" testimony probative
and relevant because information assisted jury in understanding evidence). The purpose
of the short interchange about the cycle of violence was not, in light of Anderson's entire
testimony, to focus the jury's attention on some alleged pattern of continual violence by
Harris. And Anderson never applied the "cycle of violence" model to the facts of this case
so as to suggest Harris' behavior was consistent with a perpetrator of violence. Contrast
Alba, 905 S.W.2d at 588 (prosecutor asked expert to testify regarding opinions about case
based on evidence); Kelly v. State, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992) (for novel
scientific evidence to be admissible, proponent must show reliability by, among other
things, showing technique was properly applied to occasion in question).  
          Anderson's testimony instead focused on patterns of response she had seen in
victims' behavior as those patterns relate to incidents when victims ultimately abandoned
pursuing the protective order. Anderson's testimony did not cross the line between
assisting the jury and attempting to replace the jury as trier of fact. Viewing Anderson's
testimony as a whole, we cannot say the trial court's failure to permit a Rule 705(b) hearing
"was so harmful as to require reversal." Cf. Jenkins v. State, 912 S.W.2d 793, 814 (Tex.
Crim. App. 1993) (trial court's noncompliance with Rule 705(b) harmless partially because
expert provided no damaging, inadmissible testimony in jury's presence). We overrule
Harris' third point of error.
 

IV. Conclusion
          For the reasons stated, we affirm the trial court's judgment.
 

                                                                           Donald R. Ross
                                                                           Justice

Date Submitted:      September 26, 2003
Date Decided:         February 18, 2004

Publish