

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-14-00029-CR

_____

MARGARET SUE RUFF, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 196th District Court
Hunt County, Texas
Trial Court No. 28910

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Moseley

OPINION

After Margaret Sue Ruff was convicted by a Hunt County jury of robbery, the trial court sentenced her to ten years' confinement. She has appealed, complaining that a video recording of the robbery was improperly admitted, that statements she made to police did not constitute admissible evidence because she was not administered proper warnings before giving the statements, and that she did not receive effective assistance of counsel at trial. We find no merit in her claims of error and affirm the action of the trial court.

The robbery occurred at a convenience store in Greenville, Texas, run by Noor Ali Mukhida, who was familiar with Ruff (whom he knew as Peggy) because she had been a regular customer of his for years. On the afternoon of New Year's Eve 2012, a woman entered the convenience store wearing a cap and a "do-rag" and carrying what appeared to be a gun. The woman demanded that Mukhida hand over money from the cash register and a drawer under the counter. Although the appearance of the robber was partially obscured by the cap and do-rag, Mukhida was able to see her gold tooth, which led him to recognize Ruff as the robber. At some point during the robbery, Mukhida observed "red things" on the gun and considered it might not be a genuine firearm. Steeling himself to the possibility the robber might in fact have a real gun, Mukhida picked up a large flashlight and began to attack the robber, chasing her outside the store. Outside the store, a vehicle with another woman inside it was waiting to retrieve the robber. The vehicle's driver yelled to the robber to shoot Mukhida; even so, Mukhida slammed the vehicle's windshield with the flashlight, apparently smashing it.

2

Investigating police officers found an empty vehicle with a smashed windshield a few blocks away from the convenience store; the vehicle's registration revealed it to belong to Ruff. Ruff herself was later located at one of her relative's house; when located, Ruff bore at least one laceration on her forehead. When Greenville police officer Greg Hughes questioned her whereabouts at the time of the robbery, Ruff said she had gone to the store to confront Mukhida about a friend of Ruff's whom Ruff alleged that Mukhida had been paying for sex. Hughes did not recall Ruff mentioning anything at that time about having given birth to a child sired by Mukhida. However, when Detective Jaimie Fuller interviewed Ruff three days later, Ruff said that at some earlier time, Mukhida had impregnated Ruff and that the resulting child had died while still a small infant.[1] Ruff said she went to talk to Mukhida because she heard that "he was . . . talking disrespectful about me and certain individuals that he had slept with." She said she also wanted to talk to Mukhida about the deceased infant but before she could tell him the child had died, Ruff said Mukhida began to yell at her, apparently believing that she was asking for child support. According to Ruff, this confrontation escalated to the point that Mukhida attacked her, chased her out of the store, and struck the windshield of her car. She said she pulled her own money out of her pocket to show Mukhida she had no need for his money. Ruff denied having carried a gun, but if she was shown to have had one, it was only because she picked up anything she could find in the store to defend herself against Mukhida's attack. She

---

[1]Ruff did not elaborate, but from the context of her testimony, it appears this birth happened several years before the instant events. Ruff also said she became pregnant despite Mukhida's use of a condom. Mukhida denied any such relationship.

denied having attempted to rob Mukhida and maintained that she was not the robber who was portrayed on the recorded store surveillance video.

The store and its exterior were both monitored by surveillance cameras, and Mukhida provided police with copies of the video recordings of the robbery as captured by these surveillance cameras.

## I.       Video Exhibit Properly Authenticated

Ruff's first complaint argues that the trial court erred in allowing the admission of the video recordings. If there was a way for the surveillance system to make duplicates of its recordings, Mukhida was unaware how to do so. Therefore, Mukhida's daughter used a video camera to record the display of the surveillance videos as they were played back on the store's monitors. This copy was provided to law enforcement. Ruff argues that because the video exhibit was only a copy of one actually recorded on the store's surveillance cameras, it lacked the proper authentication to be admitted.

"The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what the proponent claims." TEX. R. EVID. 901(a). In *Angleton v. State*, 971 S.W.2d 65, 67 (Tex. Crim. App. 1998),[2] the State offered an enhanced audio recording of the murder suspect and his brother discussing the murder of a woman. Rule 901 was satisfied when, as a predicate to its introduction, the sponsoring officer testified that (1) the officer had knowledge of the contents of both the original and the enhanced copies of the recording, (2) there was nothing

---

[2]"The standard of review for a trial court's ruling under one of the rules of evidence is abuse of discretion." *Angleton*, 971 S.W.2d at 67 (citation omitted).

4

audible on the enhanced copy that had not been audible on the original, (3) the officer was able to identify the speakers because he had had conversations with both men, and (4) there were distinctive elements of the conversation, such as a discussion about the killing of a woman and referencing the specific code used to deactivate the woman's home alarm system. *Id.* at 67.

In the case before us, Mr. Mukhida testified he had multiple cameras monitoring both the interior and exterior of his store. After the robbery, he watched the recording with the police. Mukhida's daughter later filmed the video as it played on the store's surveillance monitor, and Mukhida watched that copy. Mukhida said the copy, produced at trial, showed the same events as the original. Some of the events of the robbery to which Mukhida testified can be seen on the video exhibit (the robber coming into the store wearing a white baseball cap, exhibiting a gun, going behind the counter, and taking money from the register and drawer). Two police officers watched the surveillance video recording as it was shown on the store's system and recognized Ruff as the robber.

Mukhida testified that he watched the copy that was offered and admitted into evidence and that it accurately showed the events of the robbery. In her brief, Ruff inaccurately argues that when the State asked if the displayed version provided a fair and accurate copy of the original recording, Mukhida did not answer the question. This is not correct. Rather, Mukhida answered that the copy which was displayed was a "[f]air copy. I give this copy to the police officer." Reading the totality of Mukhida's testimony, it is a reasonable inference English was

5

not his native language.[3]  That said, his narrative was generally coherent (at least it appears so on the printed page), and his testimony was sufficient to establish the exhibit was what the State purported it to be—a recording of the events surrounding the robbery of Mukhida's store.  The video recording exhibit was sufficiently authenticated, and the trial court did not abuse its discretion in admitting it.

## II.    Ruff's Recorded Statements

Detective Jaimie Fuller conducted two interviews with Ruff about three days after the robbery occurred.  The day following those interviews, an arrest warrant was secured and executed.

The first interview lasted about two hours and Fuller testified that Ruff was not in custody at the time of the interview, that she was free to leave when she wished, and that she did, indeed, leave after the interview took place.  Fuller said that the purpose of this interview was to obtain Ruff's version of the events surrounding the robbery.

After this interview (which took place in the late morning), Ruff returned to the police station to secure release of some of her personal items.  At this time, the second encounter between Fuller and Ruff occurred, this consuming about ten minutes.  The thrust of this meeting was that Ruff was inquiring about recovery of some of the personal property items in her automobile and nothing even approaching an inculpatory statement or statement which might have lead to discovery of evidence was mentioned.  Although there was no predicate laid at the

---

[3]Mukhida's use of grammar and idioms was not absolutely in keeping with what would commonly be heard from native or accomplished speakers of the American version of the English language.  He sometimes asked for definitions or explanations of terms.  Even so, we observe that sometimes definitions or explanations are required for one stratum of American society to fully understand what someone from a different stratum thereof has said.

time of the introduction of the recording of this encounter that established that Ruff was not in custody at the time, the interview terminated with Ruff and Fuller leaving together to see about recovery of the personal property items. The recording of this interview, while tendered into evidence, does not appear to have been played for the jury.[4]

The State offered video recordings of these two interviews into evidence; they were admitted over Ruff's objection.

Ruff's trial objection was:

Your Honor, I would actually object under Texas Code of Criminal Procedure 38.22.[5] These interviews were not voluntary.
    In other words, they had her vehicle. She felt coerced in order to talk to the police under the circumstances. It wasn't a voluntary interview. These are not voluntary confessions; and as a result, they should not be admitted.

Ruff's appellate complaint is that Fuller's questioning of her was designed to circumvent the requirements of *Miranda v. Arizona*[6] and that admission of the recorded interviews was error where Fuller did not read Ruff her *Miranda* rights.

Ruff's point of error assumes that she was in custody; the need for the *Miranda* warnings and the constraints on the use of statements of the accused as set out in Article 38.22 of the Texas Code of Criminal Procedure apply only to custodial interrogations. *See Wolfe v. State*, 917 S.W.2d 270, 282 (Tex. Crim. App. 1996); *Shiflet v. State*, 732 S.W.2d 622, 623 (Tex. Crim.

---

[4]The content of this interview was so inconsequential (appearing to be evidence of nothing), it is something of a mystery as to the reason that it was proffered as evidence.

[5]*See* TEX. CODE CRIM. PROC. ANN. art. 38.22 (West Supp. 2013) (regulating when custodial statements of accused may be admitted and prescribing procedures for such).

[6]*Miranda v. Arizona*, 384 U.S. 436, 445, 469–72 (1966) (suspect to be informed before custodial interrogation of constitutional right to remain silent, that any statements could be used against suspect in court, and of suspect's right to consult with a lawyer.

App. 1985).  She cites *Gardner v. State*[7] and *Nguyen v. State*,[8] in seeking to maintain her claim that she was in fact in custody when Fuller conducted the interviews.  Although her trial objection does not precisely comport with her appellate point of error, in the interest of justice, we will treat this matter as preserved for our review.

The Texas Court of Criminal Appeals has outlined four general situations which may constitute custody for purposes of the application of the *Miranda* case or Article 38.22 of the Texas Code of Criminal Procedure:

(1)      when the suspect is physically deprived of his freedom of action in any significant way;

(2)      when a law enforcement officer tells the suspect that he cannot leave;

(3)      when law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted; and

(4)      when there is probable cause to arrest and law enforcement officers do not tell the suspect that he is free to leave.

*Dowthitt v. State*, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996); *see Gardner*, 306 S.W.3d at 294.  Ruff claims that the third and fourth factors are applicable to her situation.

---

[7]*Gardner v. State*, 306 S.W.3d 274, 293–95 (Tex. Crim. App. 2009) (defendant presented himself to Mississippi sheriff to "turn himself in" for his wife's murder; defendant not under arrest when he spoke by telephone with Texas investigating officer, even if officer had probable cause to secure warrant, which he had not done; defendant failed to establish he was in custody during telephone conversation with Texas officer).

[8]*Nguyen v. State*, 292 S.W.3d 671, 677 (Tex. Crim. App. 2009) (defendant was in custody after he was arrested for traffic violations, so statement regarding possession or ownership of drugs was custodial).

As to the fourth *Dowthitt* factor, Ruff acknowledges that Fuller told her she was free to leave.[9] Fuller denied having threatened or coerced Ruff, and no such tactics are observed on the recording of the interview. Throughout the interview, Fuller questioned Ruff about Ruff's behavior as she had observed it on the store's surveillance video recording, and Fuller demonstrated unrestrained skepticism of Ruff's explanation of the occurrences that were preserved on the recording. While we find no moment where Fuller actually told Ruff that she was a suspect,[10] it is apparent from Fuller's questioning that Ruff was then being investigated for her participation in the robbery. At least once during the interview, Fuller said that from her perspective, she believed Ruff had robbed Mukhida, saying "Peggy, from what I'm looking at, we're looking at a robbery." Even being the "focus" of an investigation does not necessarily render a person "in custody" for purposes of providing the warnings mandated by *Miranda* or by Article 38.22. *Gardner*, 306 S.W.3d at 294. Rather, "the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)).

Ruff was subjected to nothing which approached a formal arrest. Ruff came to the police station of her own volition. She was never placed in any kind of restraints at any time during the recorded interview. After the interview concluded, Ruff was allowed to leave. She returned about three and one-half hours after the conclusion of the first interview for a brief discussion

---

[9]Fuller testified to this at trial and is heard to tell Ruff in the beginning of the interview that she was free to leave whenever she liked.

[10]Officer Greg Hughes testified that he told Ruff she was a suspect when he located her the night of the robbery. He read Ruff her *Miranda* rights, but no statement she made that evening is at issue here.

with Fuller about the status of her seized vehicle and its contents, after which some of her personal effects were returned to her. Again, Ruff was permitted to leave. While at that point Fuller may well have had probable cause to seek an arrest warrant for Ruff (which was indeed done the next day), at no point did she tell Ruff she was not free to leave, and Ruff, in fact, left the police station on both occasions after talking to Fuller. Even if probable cause to arrest Ruff existed at the time of Fuller's interview, there is no "manifestation of probable cause, combined with other circumstances, [which] would lead a reasonable person to believe that [s]he [was] under restraint to the degree associated with an arrest." *Dowthitt*, 931 S.W.2d at 255; *see also Herrera*, 241 S.W.3d at 532 (state of custody is reviewed on ad hoc basis considering all the circumstances and asking whether, under all those circumstances, "'a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave'") (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)).

Ruff does not explain how the interview technique employed by Fuller somehow circumvented the requisites of *Miranda*. She acknowledges the situation at bar is not akin to those found in *Missouri v. Seibert*, 542 U.S. 600 (2004), or *Martinez v. State*, 272 S.W.3d 615 (Tex. Crim. App. 2008), wherein police action was found to have been effectively designed to question arrested defendants without administering *Miranda* warnings, giving the warnings only later, after incriminating statements had been made. Because there is no indication that Ruff was in custody when she was interviewed by Detective Fuller, the requirements of *Miranda* and Article 38.22 of the Texas Code of Criminal Procedure did not apply. The second point of error is overruled.

10

### III. No Showing of Ineffective Assistance of Counsel

Ruff claims her trial counsel was ineffective for a variety of reasons, listing the following: (1) counsel's failure to discuss possible defenses during voir dire and using the term "burden of persuasion" rather than "burden of proof" at that time; (2) counsel's failure to object to the admission of Ruff's affidavit in which she said she went to the store to discuss the child she claimed Mukhida had fathered; (3) counsel's failure to secure rulings on pretrial motions; (4) the failure of counsel to move for a directed verdict at the conclusion of the State's case or to request a lesser-included offense instruction in the jury charge; and (5) counsel's failure to complain about potential circumvention of the requirement for *Miranda* warnings associated with the interviews of Ruff. Although Ruff concedes that trial counsel "performed well in some circumstances," she argues that the aggregate effect of the above alleged failures rendered counsel's performance below the standard of objective reasonableness required by *Strickland v. Washington.*[11]

Ineffective assistance of counsel claims cannot "be built on retrospective speculation," but must be firmly rooted in the record, with the record itself affirmatively demonstrating the alleged ineffectiveness. *Bone v. State*, 77 S.W.3d 828, 835 (Tex. Crim. App. 2002). The appellant must show that trial counsel's representation fell below an objective standard of reasonableness. *Fox v. State*, 175 S.W.3d 475, 485 (Tex. App.—Texarkana 2005, pet. ref'd). We indulge a strong presumption that counsel's conduct falls within the wide range of reasonable, professional assistance, and was motivated by sound trial strategy. *See Strickland*,

---

[11]*Strickland v. Washington*, 466 U.S. 668, 687 (1984) (to establish ineffective assistance of counsel, defendant must show counsel's performance was constitutionally deficient and such deficient performance prejudiced defense).

11

466 U.S. at 689; *Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994). "If counsel's reasons for his conduct do not appear in the record and there is at least the possibility that the conduct could have been legitimate trial strategy, we will defer to counsel's decisions and deny relief on an ineffective assistance claim on direct appeal." *Ortiz v. State*, 93 S.W.3d 79, 88–89 (Tex. Crim. App. 2002).

The record on direct appeal is often insufficiently developed to support a claim of ineffective assistance of counsel, even if it were to exist. The best way to make a sufficient record to support such a claim is by the use of a hearing on a motion for new trial or a hearing on a petition for habeas corpus. *Jackson*, 877 S.W.2d at 772–73 (Baird, J., concurring). When facing a silent record as to defense counsel's strategy, an appellate court will not speculate as to counsel's tactics or reasons for taking or not taking certain actions. *Id.* at 771. Because the trial record is directed to the issues of guilt/innocence and punishment, an additional record focused specifically on the conduct of counsel (such as a record of a hearing on a motion for new trial asserting ineffective assistance of counsel) is generally needed. *Kemp v. State*, 892 S.W.2d 112, 115 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd). Only when "'counsel's ineffectiveness is so apparent from the record'" will an appellant prevail on direct appeal absent a hearing on a motion for new trial asserting an ineffective assistance of counsel claim. *Freeman v. State*, 125 S.W.3d 505, 506–07 (Tex. Crim. App. 2003) (quoting *Massaro v. United States*, 538 U.S. 508 (2003)); *Kemp*, 892 S.W.2d at 115.

Here, there was no motion for new trial filed, and we find nothing in the record to suggest that Ruff attempted to make a record of her trial counsel's strategies (or lack thereof) and his

12

reasons for trying this case as he did. Other than her list of criticisms of trial counsel's performance, Ruff does not elaborate on how any of these alleged shortcomings might have prejudiced her defense. An appellant who claims to have lacked the effective assistance of counsel must "affirmatively prove prejudice," and she "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 693–94. Failure to satisfy either prong of the *Strickland* test is fatal to such a claim. *See Ex parte Martinez*, 195 S.W.3d 713, 730 n.14 (Tex. Crim. App. 2006). A reviewing court may consider the prejudice prong without considering whether performance was deficient if it is easier to dispose of an ineffective assistance claim on that basis. *Strickland*, 466 U.S. at 697.

Ruff has shown no reasonable probability that the outcome of her trial would have been different if not for the purported inadequacies of her trial attorney. The State presented video-recorded evidence which revealed a woman in the convenience store. Three people (the victim and two police officers) each identified the woman as Ruff. The woman in the surveillance video is portrayed as entering the store with what appeared to be a pistol and then taking money from both the cash register and from another drawer beneath the counter. Ruff's vehicle was found with a smashed windshield, damage which corresponded with testimony from Mukhida that he struck the robber's vehicle with a large flashlight.

In her interview, Ruff recounted her version of events, wherein she claimed she went to the store to discuss a deceased child whom she claimed that Mukhida fathered; the jury could

13

have disbelieved Ruff's story that Mukhida had berated and attacked her.  There is nothing in Ruff's briefing to hint at any prejudice her defense suffered because of what she claims were ineffective aspects of her trial representation.  We overrule this point of error.

We affirm the trial court's judgment and sentence.


Bailey C. Moseley
Justice

Date Submitted:     June 11, 2014
Date Decided:       June 25, 2014

Do Not Publish