ACCEPTED
13-14-00747-CR
THIRTEENTH COURT OF APPEALS
CORPUS CHRISTI, TEXAS
6/15/2015 2:39:10 PM
CECILE FOY GSANGER
CLERK

## NO. 13-14-00747-CR

### IN THE COURT OF APPEALS

FILED IN
13th COURT OF APPEALS
CORPUS CHRISTI/EDINBURG, TEXAS
6/15/2015 2:39:10 PM
CECILE FOY GSANGER
Clerk

### FOR THE

### THIRTEENTH COURT OF APPEALS DISTRICT

### OF TEXAS

### CORPUS CHRISTI, TEXAS

**RAFAEL TREVINO,**
**Appellant**

**VS.**

**THE STATE OF TEXAS,**
**Appellee**

**Trial Cause No. 2011-CR-0742**
**Appeal from the 379th District Court**
**Bexar County, Texas**
**Hon. Ron Rangel, Presiding**

### BRIEF FOR APPELLANT

**MICHAEL D. ROBBINS**
**Assistant Public Defender**
**Paul Elizondo Tower**
**101 W. Nueva St., Suite 370**
**San Antonio, Texas 78205**

**ORAL ARGUMENT**     **(210) 335-0701**
**NOT REQUESTED**     **FAX (210) 335-0707**
**mrobbins@bexar.org**
**Bar No. 16984600**

**ATTORNEY FOR**
**APPELLANT**

i

## Identity of Parties and Counsel

Pursuant to TEX. R. APP. P. 38.1(a) (West 2015), the parties to this suit are as follows:

(1)  **RAFAEL TREVINO,** TDCJ #01966694, Garza West Transfer Facility, 4250 Highway 202, Beeville, Texas 78102, is the appellant and was the defendant in trial court.

(2)  The **STATE OF TEXAS**, by and through the Bexar County District Attorney's Office, Paul Elizondo Tower, 101 W. Nueva St., San Antonio, Texas 78205, is the appellee and prosecuted this case in the trial court.

The trial attorneys were as follows:

(1)  Rafael Trevino was represented by **SUZANNE MARIE KRAMER,** 325 S. Main Ave., San Antonio, Texas 78204. Ms. Kramer was assisted during jury selection by **BRENDA LEVENSTEIN**, P.O. Box 461225, San Antonio, Texas 78246.

(2)  The State of Texas was represented by **SUSAN D. REED** (succeeded by **NICHOLAS LAHOOD),** District Attorney, and **JAN ISHCY** and **ZACH EDWARDS,** Assistant District Attorneys, Paul Elizondo Tower, 101 W. Nueva St., San Antonio, Texas 78205.

The appellate attorneys are as follows:

(1)     Rafael Trevino is represented by **MICHAEL D. ROBBINS**, Assistant Public Defender, Paul Elizondo Tower, 101 W. Nueva St., Suite 370, San Antonio, Texas 78205.

(2)     The State of Texas is represented by the **BEXAR COUNTY DISTRICT ATTORNEY'S OFFICE**, Appellate Division, Paul Elizondo Tower, 101 W. Nueva St., Suite 710, San Antonio, Texas 78205.

The trial judge was **HON. RON RANGEL**, 379th District Court, Cadena-Reeves Justice Center, 300 Dolorosa St., 4th Floor, San Antonio, Texas 78205.

# Table of Contents

Page

Identity of Parties and Counsel . . . . . . . . . ii

Table of Contents . . . . . . . . . . . iv

Table of Authorities . . . . . . . . . . v

A Note Regarding Record References . . . . . . . . vii

Statement Regarding Oral Argument . . . . . . . . vii

Statement of the Case . . . . . . . . . . 1

Issue Presented . . . . . . . . . . . 2

## POINT OF ERROR

The trial court erred when it overruled Appellant's oral motion to suppress, because Mr. Trevino's unwarned statement to police was made during custodial interrogation, in violation of the Constitution of the United States and the laws of Texas. (RR 4, 24).

Statement of Facts . . . . . . . . . . 3

Summary of the Argument . . . . . . . . . 17

Argument . . . . . . . . . . . 18

    Appellant's Point of Error (Restated) . . . . . . 18

Conclusion and Prayer . . . . . . . . . 29

Word Count Certificate of Compliance . . . . . . 30

Certificate of Service. . . . . . . . . . 30

## **Table of Authorities**

Page

Constitution

U.S. CONST. amend. V . . . . . . . . 24,27,28

Statutes

TEX. PENAL CODE § 19.02 (West 2011) . . . . . . 1

TEX. CODE CRIM. PROC. art. 28.01 (West 2006) . . . . . 19

TEX. CODE CRIM. PROC. art. 38.22 (West 2005) . . . . 18,20,25

TEX. CODE CRIM. PROC. art. 38.23 (West 2005) . . . . .20,21

Rules

TEX. R. APP. P. 26.3 (West 2015) . . . . . . . 1

TEX. R. APP. P. 33.1 (West 2015) . . . . . . . 20

TEX. R. APP. 38.1 (West 2015) . . . . . . . ii

TEX. R. APP. P. 44.2 (West 2015) . . . . . . . 28

Cases

*Amador v. State*, 221 S.W.3d 666 (Tex. Crim. App. 2007) . . . 23

*Ancira v. State*, 516 S.W.2d924 (Tex. Crim. App. 1974) . . . 25

*Armendariz v. State*, 123 S.W.3d 401 (Tex. Crim. App. 2009) . . . 23

*Black v. State*, 362 S.W.3d 626 (Tex. Crim. App. 2012) . . . 19

*Dowthitt v. State*, 931 S.W.2d 244 (Tex. Crim. App. 1996) . . .24,25

*Florida v. Bostwick*, 501 U.S. 429 (1991) . . . . . . 25

*Gardner v. State*, 396 S.W.3d 274 (Tex. Crim. App. 2009) . . .25,26

*Gutierrez v. State*, 221 S.W.3d 680 (Tex. Crim. App. 2007) . . . 23

*Guzman v. State*, 955 S.W.2d 85 (Tex. Crim. App. 1997) . . . . 23

*Herrera v. State*, 241 S.W.3d 520 (Tex. Crim. App. 2007) . . .24,25

*Krause v. State*, 243 S.W.3d 95 (Tex. App. – Houston [1st Dist.] 2007, pet. ref'd)
. . . . . . . . . . . .19,20

*Miranda v. Arizona*, 384 U.S. 436 (1966) . . . . 20,24,25,28

*Shiflet v. State*, 732 S.W.2d 622 (Tex. Crim. App. 1985) . . . . 25

*Urias v. State*, 155 S.W.3d 141 (Tex. Crim. App. 2004) . . . . 18

*Wicker v. State*, 740 S.W.2d 779 (Tex. Crim. App. 1987) . . . . 18

## A Note Regarding Record References

In this brief, references to the 10-volume reporter's record will be thus: (RR 3, 45); and to the clerk's record will be thus: (CR, ___). The tenth volume contains the exhibits and is incorrectly labeled Volume 1 of 10. References to this volume will be thus: (RR Exhibits, SX___). References to State's Exhibit 12, the DVD of Mr. Trevino's statement, which is filed separately from the other exhibits, will reference the time-stamp on the video, and be thus: (SX12, 5:53:45).

## Statement Regarding Oral Argument

The issues raised in this appeal may be determined from the record and legal authorities alone. For that reason, the undersigned counsel does not request oral argument, but will present oral argument if it is requested by the State and granted by the Court.

TO THE COURT OF APPEALS FOR THE THIRTEENTH COURT OF APPEALS DISTRICT OF TEXAS:

This brief is filed on behalf of Appellant, Rafael Trevino, by Michael D. Robbins, Assistant Public Defender.

## Statement of the Case

Appellant Rafael Trevino was charged by indictment with the offense of felony murder.[1] (CR, 11). A jury was sworn (RR 3, 4), and Mr. Trevino pleaded not guilty. (RR 3, 12). Following evidence and arguments of counsel, the jury found Appellant guilty of murder, as charged in the indictment. (CR, 204; RR 7, 70). Mr. Trevino elected that the jury assess punishment in case of conviction. (CR, 181). The trial jury assessed a sentence of 27 years. (CR, 214; RR 9, 17). The trial court sentenced Mr. Trevino accordingly. (CR, 216-217; RR 8, 19).The trial court certified Appellant's right to appeal. (CR, 215). Mr. Trevino timely filed notice of appeal.[2] (CR, 231-232). This appeal follows.

---

[1] A felony of the first degree, in violation of TEX. PENAL CODE § 19.02(b)(3) (West 2011). The charging language, but not the alleged offense, was modified by a subsequent amendment to the indictment. (CR, 66-71).

[2] Trial counsel filed notice of appeal beyond the 30-day deadline. (CR, 228-229). Appellate counsel obtained permission from the Fourth Court of Appeals to file a late notice of appeal pursuant to TEX. R. APP. P. 26.3 (West 2015), and therefore filed his notice of appeal timely.

## Issue Presented

## Appellant's Point of Error

The trial court erred when it overruled Appellant's oral motion to suppress, because Mr. Trevino's unwarned statement to police was made during custodial interrogation, in violation of the Constitution of the United States and the laws of Texas. (RR 4, 24).

## Statement of Facts

**An overnight tragedy.**[3]

**Andrea Hernandez** met Appellant Rafael Trevino in 2007. They started dating, and moved in together. They met in San Antonio but later moved to Houston. (RR 3, 16). The couple never married. (RR 3, 17). Their first child, Rafael Trevino ("Baby Rafael"), was born on February 25, 2009. (RR 3, 17-18). Both parents took care of Baby Rafael. (RR 3, 19). Mr. Trevino was a good parent to his son. (RR 3, 20). Mr. Trevino worked while they lived in Houston, and Ms. Hernandez was a stay-at-home mom. (RR 3, 21). The young couple and their baby moved back to San Antonio so she could go to school. (RR 3, 21-22). They had another baby on the way. Ms. Hernandez therefore also needed to work. The couple moved in with Ms. Hernandez's parents. (RR 3, 22).

Ms. Hernandez's parents lived at 10419 Medio Creek (RR 3, 23), in a two-story, three-bedroom house. All bedrooms were upstairs. (RR 3, 24). The bedrooms were all lined up beside one another. Ms. Hernandez's parents slept in the master bedroom. Next to that was an unused guest bedroom. (RR 3, 25). At the far end of the hall was the bedroom that Ms. Hernandez and Mr. Trevino slept in.

---

[3] This brief summarizes the testimony of the State's witnesses as given at the trial. Appellant does not concede the truth of this testimony. There are inconsistencies in the testimony of the various witnesses, which will be reflected in this summary.

(RR 3, 26). Baby Rafael and the new baby, Liliana Ofelia Trevino, slept in their parents' room. (RR 3, 27). Liliana was born on Septmber 15, 2010. (RR 3, 54).

Liliana was colicky, but was otherwise healthy. Ms. Hernandez took Liliana to the doctor on October 9, 2010, because the baby was running a fever and her neck was a little swollen. (RR 3, 28). The visit to the doctor led to a stay in Methodist Children's Hospital. (RR 3, 29). Liliana was in the hospital for four days. Her mother stayed with her. When the baby was released, the only medication she had to take was children's Tylenol. She did not have any health issues, other than still being colicky. (RR 3, 30-31).

November 4, 2010, was a Thursday. Liliana passed away overnight on November 3 – 4. (RR 3, 31). Mr. Trevino was Liliana's caretaker on November 3. Ms. Hernandez had not obtained employment yet, and was in school. Her parents were retired, but spent a lot of time away from the house. (RR 3, 32). Mr. Trevino did not mind staying home with the baby. After Ms. Hernandez got home from school she and Mr. Trevino went to the park with Baby Rafael. Liliana stayed at the house with her grandparents. (RR 3, 33).

The baby was not in distress when her parents got home from the park at about 5:00 p.m. (RR 3, 34). They all had dinner and watched TV afterwards. (RR 3, 35). Liliana was on her baby swing, and Baby Rafael was on a couch with his parents. (RR 3, 36). At about 10:00 p.m., they all went upstairs. Ms. Hernandez

4

took a shower. (RR 3, 37). Then, she and Baby Rafael went to bed in the guestroom. (RR 3, 38). Liliana stayed in her parents' room with her father. (RR 3, 39). Ms. Hernandez woke up at about 6:30 a.m. on November 4. (RR 3, 44). Ms. Hernandez walked into the bedroom where Mr. Trevino and Liliana were. They both appeared to be sleeping, Liliana in her bassinette and Mr. Trevino in the bed. Baby Rafael was still in the guestroom. (RR 3, 45). Ms. Hernandez went into the bathroom, where she remained for 15 or 20 minutes. (RR 3, 45-46). Usually, Mr. Trevino would be up with the baby by that time, but he was not up that day. Mr. Trevino came into the bathroom and spoke to Ms. Hernandez. He told her that the baby had not awaked for her feeding and that he was going to check on her. Mr. Trevino would not normally have done this. He left the bathroom, and then came back and said that the baby was not breathing. (RR 3, 46).

Ms. Hernandez thought Mr. Trevino was lying. She went into the bedroom and checked. The baby was lying on her back and not breathing. Liliana was wearing different clothing than she had worn the night before. (RR 3, 47). Mr. Trevino picked the baby up and handed her to Ms. Hernandez. (RR 3, 47-48). The baby was very cold. Ms. Hernandez started screaming. Her parents rant into the room. Her father tried to perform CPR, and someone called Emergency Medical Services ("EMS"). (RR 3, 48). When EMS arrived, they told the family that there

was nothing they could do for the baby. They wrapped Liliana in a blanket and handed here to Ms. Hernandez, who placed her in the in her bassinette. (RR 3, 49).

Police detectives, Medical Examiner personnel, and Ms. Hernandez's sisters showed up. The Medical Examiner personnel took Liliana with them. Mr. Trevino was quiet but supportive during this period. (RR 3, 50). On November 16, 2010,[4] according to Ms. Hernandez, she and Mr. Trevino were interviewed separately by police detectives. The detectives were the first ones to tell the parents that the baby did not die of natural causes. (RR 3, 51). The parents went to the police station together, and left together. (RR 3, 52). As they walked out of the police station, Mr. Trevino admitted that he shook the baby and may have dropped her before. He said that it was his fault that Liliana died. Ms. Hernandez was shocked. (RR 3, 53). Ms. Hernandez and Mr. Trevino had another child, who was conceived after Liliana died. (RR 3, 55). Ms. Hernandez gave contradictory answers about whether she loved or hated Mr. Trevino. (RR 3, 61, 64).

**Robert Hernandez** was Andrea's father. (RR 3, 68). He recalled that his daughter and Mr. Trevino were having problems and moved in with him and his wife so that they could get back on their feet. Andrea would go to school first, and then Mr. Trevino would go to school. Mr. Hernandez would pay for their

---

[4] This was not the correct date. The time-mark on the video of Mr. Trevino's statement (RR Exhibits, SX12) shows that it was actually November 5, which is confirmed within the context of the video.

6

education. They moved in right after Liliana was born. (RR 3, 69). Rafael Trevino was Liliana's primary caretaker. He was very protective of his daughter, and he rejected Mr. Hernandez's offers to assist. (RR 3, 72). Liliana appeared to be alright after her hospital stay, although she was still congested. (RR 3, 74).

Mr. Hernandez was able to observe Liliana on November 3, and she was not in distress. (RR 3, 75-76). Mr. Hernandez and his wife went to sleep at 10:30 or 11:00 p.m. He did not hear anything unusual during the night. (RR 3, 76). He was awakened by his daughter's screams early the following morning. She was yelling that the baby was not breathing and was changing color. Mr. Hernandez ran over and checked the baby. He told his daughter to call 9-1-1, and he started CPR. He took the baby downstairs and when EMS arrived he handed her over to them. (RR 3, 77). Mr. Trevino was right behind him. EMS technicians took the baby into the ambulance and worked on her there. (RR 3, 78). Mr. Hernandez never saw Mr. Trevino carry the baby in an inappropriate way, and he appeared to be competent to raise a child. Mr. Hernandez's initial reaction was that the hospital has missed something when Liliana was there, and he continued to believe down to the time of the trial. (RR 3, 80-81).

**Gloria Hernandez** was Robert's wife and Andrea's mother. (RR 3, 84). She felt that Mr. Trevino acted appropriately with Liliana and Baby Rafael. (Rr 3, 87-88). Much of her testimony is repetitive of that of her daughter and husband, and

7

will not be repeated here. She recalled that Mr. Trevino was trying to calm Baby Rafael down during the excitement after Andrea screamed. Mr. Trevino was very quiet and very serious during that time. (RR 3, 92).

**Emergency personnel respond.**

**Michael Pierce** was a paramedic with the San Antonio Fire Department. (RR 3, 96). He responded to the call to the Hernandez home. (RR 3, 97). Upon arrival, the paramedics went inside the house. The family was inside with an unresponsive infant. The paramedics took the baby into the ambulance. (RR 3, 99). They received the dispatch at 7:08 a.m. at arrive at the house eight minutes later. (RR 3, 100). The baby's mother reported that the baby was fine at 2:00 a.m. (RR 3, 101). The baby had lividity (blood pooling), which indicated that her heart had stopped beating more than 15 minutes earlier and that she could not be revived. (RR 3, 102).

The lividity was on the infant's face, which indicated that she was lying face down. (RR 3, 104). The infant was pale and cool to the touch. The paramedics performed CPR and attached an EKG monitor. (RR 3, 105). There were no signs of life. Their medical director told the paramedics to cease their efforts. The medical director, who was in the area, came to the house and told the family that the child had died. The paramedics called the police. (RR 3, 106). The time of death was

listed as 7:25 a.m., which is the time the paramedics ceased their efforts. (RR 3, 107). The child bore no obvious signs of trauma. (RR 3, 108).

**Mr. Trevino gives a statement to the police.**

**Greg Garvelli** was a homicide detective with the San Antonio Police Department ("SAPD") in November 2010.[5] (RR 4, 26). He received a call from the Medical Examiner in the case regarding an autopsy to be performed on a baby, asking him to be present. After the autopsy, he contacted his sergeant and advised that this was likely a murder case. The police contacted the family on November 4 or 5. (RR 5, 28). The police contacted Mr. Trevino and the others in the home and asked them to come down to the homicide office, which they did. Everyone in the home gave a statement. Detective Garvelli was the lead detective and was present at Mr. Trevino's statement. (RR 3, 29). Mr. Trevino, who appeared nervous, was not under arrest and was told that. (RR 3, 30). State's exhibit 12 was a DVD of the interview, and was admitted over objection.[6] (RR 3, 32). The video was played in short excerpts, with narration by Detective Garvelli, (RR 3, 33-44) and, later at the request of the defense, 45 minutes of it was played uninterrupted. (RR 4, 54).

During the early stages of the interview, Mr. Trevino discussed Liliana's prior hospitalization. (RR 4, 33; SX12, 5:34:50 – 5:35:33). Without unnecessarily

---

[5] By the time of the trial, he had been promoted to patrol sergeant. (RR 4, 25).
[6] This is the subject of Appellant's Point of Error.

9

lengthening this brief, it is sufficient to say that, in the early part of the interview, Mr. Trevino's version of what happened was not terribly different from Andrea Hernandez's testimony. *See generally*, (RR 4, 33-38; SX12 excerpts through 5:56:12). At one point during the interview, Detective Garvelli left the room, and re-entered in the company of Detective Richard Richardson. (RR 4, 38-39). The questioning took a rougher more ominous tone, and Mr. Trevino's answers began to change.

The detectives told Mr. Trevino that the Medical Examiner's autopsy showed that the cause of death was injuries to the brain, and that this was a homicide. (RR 4, 39; SX12, 6:11:02 – 6:11:55). During this phase of the interview, Mr. Trevino did not say how the injuries were caused. (RR 4, 40-41). The detective told Mr. Trevino that he was the only person with Liliana at the relevant time. He responded that he would not hurt her. (RR 4, 41; SX12, 6:13:32 – 6:14:05). The detectives prodded Mr. Trevino by saying that accidents happen all the time. Mr. Trevino replied that he would not hurt his daughter, even by accident. He then changed his story and told the detectives that Liliana fell on her shoulder. He said she slipped out of his hands and that it was his fault that she fell. (RR 4, 41; SX12, 6:20:50 – 6:22:04). Mr. Trevino said that Liliana cried when she hit the floor, but that she stopped crying when he placed her in her basinet. (RR 4, 42; SX12, 6:24:58 – 6:25:32).

Mr. Trevino said that he was frustrated when he dropped his baby. (RR 4, 43; SX12, 6:33:57 – 6:34:02). He said did not hit her. (RR 3, 44; SX12, 6:34:02 – 6:34:24).

The next excerpt of the video that was played for the jury was from nearly 50 minutes after the previous excerpt. Mr. Trevino told the detectives that he did not hit or shake Liliana, but the she fell. (RR 4, 50; SX12, 7:23:57 – 7:24:17). Mr. Trevino ultimately changed his story as said that he shook Liliana a couple of times. He demonstrated how he did this, using a plastic water bottle. He was frustrated because she started crying. She eventually calmed down. Her eyes stayed open, and she was breathing fast. She fell asleep, and Mr. Trevino put her down. (RR 4, 51; SX12, 7:34:15 – 7:37:04).

Mr. Trevino was not read his rights by the police at any time before or during the interview, which ended at about 7:45 p.m. Mr. Trevino left the homicide office. Detective Garvelli obtained a warrant. Mr. Trevino was arrested and brought back to the homicide office at about 9:00 p.m. (RR 4, 52). After observing part of the autopsy that morning, Detective Garvelli knew that the injuries had to be inflicted by some sort of outside force. (RR 5, 5-6). Mr. Trevino became a suspect during the interview, when he said that he had sole care of the baby during the relevant time period. That admission caused the detectives to focus on Mr. Trevino. (RR 5, 6).

11

**Liliana Trevino's prior hospitalization.**

**Dr. Kelly Spence** was a pediatrician at Children's Methodist Hospital in San Antonio. (RR 5, 9-10). She reviewed Liliana's medical records from her hospital stay, as well as the autopsy report. (RR 5, 11, 12). Dr. Spence treated Liliana Trevino during the child's stay at the hospital, from October 9 until October 12, 2010. The child came in with cold symptoms and was diagnosed with some sort of virus. She was discharged with no medications ordered. (RR 5, 12). Liliana had no symptoms during her hospital stay which would correlate to the injuries that caused her death. (RR 5, 14). A spinal tap was performed at the hospital. The autopsy indicated bleeding in the spinal fluid area which was not present during the spinal tap. (RR 5, 15).

**The first detective on the scene.**

The initial detective to respond in this case was **Detective L. Carrion**, who went to the crime scene and gathered general information. (RR 6, 7). After declaring Liliana deceased, EMS returned her to her mother. (RR 6, 9). The child was upstairs in her basinet. Detective Carrion did not see any visible injuries and did no further investigation pending the autopsy. (RR 6, 10).

The following day, the Medical Examiner called and reported that there were injuries. They requested a homicide detective. Detective Carrion was present at the autopsy. When the death was ruled a homicide, he contacted the parents. (RR

6, 11-12). The detective asked the parents to come to the homicide office to give statements, and they both complied. Detective Carrion interviewed Ms. Hernandez, who was cooperative. (RR 6, 12). Ms. Hernandez's version of events was consistent with what she told the detective the day before. (RR 6, 13). The detective did not "escalate" his interview with Ms. Hernandez. After his interview with the mother, he looked in on Detective Carvelli's interview with Mr. Trevino. (RR 6, 13).

**Autopsy of an infant.**

**Dr. Elizabeth Peacock** had retired from the Bexar County Medical Examiner's Office by the time of the trial. (RR 6, 21). She performed the autopsy on Liliana Trevino. (RR 6, 25). An X-ray of the child showed a fractured and displaced collar bone. (RR 6, 30). The fracture happened after death, and could not have been caused by CPR. (RR 6, 31). During the autopsy, Dr. Peacock saw a number of head injuries. (RR 6, 32). These were indicative of the amount of force applied, but they did not cause death. (RR 6, 34). The doctor found five internal injuries. (RR 6, 35). These could have been cause by striking the skull against and object – even a mattress – or by striking an object against the skull. (RR 6, 44-45).

In sum, Dr. Peacock found: (1) blunt force trauma to the head and brain, with five impact sites; (2) post-mortem fracture to the clavicle; and (3) an otherwise anatomically normal female infant. The cause of death was cranial-

13

cerebral blunt force injury. (RR 6, 45). These five impacts are not likely to have occurred by just dropping the baby. There were subdural hemorrhages that might be up to two weeks old. (RR 5, 46) However, the scalp contusions were less than a day old. (RR 6, 48). Some of the hemorrhaging was old enough that it could have been caused during birth (RR 6, 48-49), but the injuries that caused the death were less than a day old. (RR 6, 51).

**Dr. James Lukefahr** was a pediatrician specializing in child abuse and neglect. (RR 6, 68). He was not involved in the autopsy, but subsequently reviewed Dr. Peacock's report. (RR 6, 69). He knew that a spinal tap was performed at Children's Methodist Hospital. If there had been blood in Liliana's brain at that time, it would have been present in the spinal fluids. (RR 6, 70).The spinal tap showed no red blood cells. (RR 6, 71). Dr. Lukefahr viewed the autopsy photo of the brain, taken from beneath. The injuries he saw are called subarachnoid hemorrhages. (RR 6, 74; RR Exhibits, SX16). There were bruises and contusions on the surface of the brain. It would have taken a significant amount of force applied to the head to cause these injuries to the underside of the brain. The brain would have to bounce within the skull cavity. The injury occurred after the spinal tap. (RR 6, 75).

**The defense witness.**

The sole witness for the defense was the child's mother, **Andrea Hrnandez**, on recall. She refreshed her memory by reading several letters she wrote to Mt. Trevino long after Liliana's death. (RR 6, 81). In a letter dated November 27, 2012, Ms. Hernandez expressed guilt. Sometimes she felt that Liliana was mad at her. She felt guilty because she could not hear her daughter crying in the next room and was not able to help her. The letter expressed love for Mr. Trevino. Ms. Hernandez wanted to be with him. (RR 6, 88). She wished that he was out of jail. She did not want him to go to prison. (RR 6, 89).

In a letter written on June 24, 2015, Ms. Hernandez told Mr. Trevino that she was jealous after the children were born, because she did not get enough attention from Mr. Trevino. They had a third child after Liliana died. (RR 6, 89). In the letter, Ms. Hernandez made reference to the fact that they made beautiful babies. She said could not wait for him to come home, but she was afraid for him to be around her kids. (RR 6, 90).

In a letter written on August 23, 2013, Ms. Hernandez said she was afraid she might get into trouble and that she was a bad girl. There was another reference to wanting Mr. Trevino to come home. (RR 3, 91). Mr. Trevino was not violent with Ms. Hernandez, and she did not witness him being violent with the children. He was the only one Liliana responded to. (RR 6. 92).

On cross-examination, Ms. Hernandez said that she had not watched the video of Mr. Trevino's police interrogation. (RR 6, 93). She had only one boyfriend before she and Mr. Trevino got together. He was the first man she wanted to have children with. (RR 6, 94). She felt guilty because she loved the man who killed her baby. She tried to stop loving him, but was unable to do so. The guilt ate her up inside, and she finally did break up with Mr. Trevino. (RR 6, 95). She admitted that Mr. Trevino was violent with her once, but it was before the children were born. (RR 6, 88).

**The verdict, punishment phase, and post-trial procedures**.

Following the reading of the charge and argument of counsel, the jury found Mr. Trevino guilty of murder, as charged in the indictment. (CR, 204; RR 7, 70). Nothing in the punishment phase is relevant to the issue in this appeal. The jury court assessed a sentence of 27 years (CR, 214; RR 9, 17). The trial court sentenced accordingly. (CR, 216-217; RR 9, 19). The trial court properly certified that this is not a plea bargained case, and Mr. Trevino has the right to appeal. (CR, 215). Mr. Trevino's appellate counsel timely filed notice of appeal. (CR, 231-232). The trial court appointed the Public Defender's Office to represent Mr. Trevino. (CR, 230). This appeal follows.

## Summary of the Argument

On the day after Liliana's death, the police detectives asked Mr. Trevino and Andrea Hernandez, the child's mother, to go to the homicide office to give statements. Mr. Trevino's statement was recorded on DVD. The defense made an oral motion to suppress Mr. Trevino's statement, and a hearing was held on the motion, outside the presence of the jury. The trial court overruled the motion to suppress. The DVD was played to the jury.

The oral motion to suppress was in proper form and substance, and preserved error. The trial court did not enter findings of fact and conclusions of law, as required by law. Therefore, this Honorable Court must abate this appeal and order findings and conclusions.

The trial court erred when it overruled the motion to suppress. Although the detectives told Mr. Trevino he was free to leave, and Mr. Trevino actually did leave the homicide unit briefly prior to being arrested, the detectives at the same time created a situation in which a reasonable innocent person would feel that his freedom of movement was substantially limited. Therefore, Mr. Trevino's unwarned statement was custodial, and was inadmissible.

**Appellant's Point of Error (Restated)**

The trial court erred when it overruled Appellant's oral motion to suppress, because Mr. Trevino's unwarned statement to police was made during custodial interrogation, in violation of the Constitution of the United States and the laws of Texas. (RR 4, 24).

**The appeal must be abated for lack of findings of fact/conclusions of law.**

This Point of Error concerns the denial of an oral motion to suppress most of Mr. Trevino's recorded oral statement. There is a contested issue as to whether the statement was made during custodial interrogation. At the end of suppression hearing, the trial court said: "Based on the Court's review of State's Exhibit Number 12 [the DVD recording of the statement] from about 6:13 to about 6:34, the Court will deny the defense motion to suppress. Anything else?" (RR 4, 24). There was no request for findings of fact and conclusions of law, and none were given.

"When the voluntariness of a statement is challenged, article 38.22, § 6, of the Texas Code of Criminal Procedure requires the trial court to make written findings of fact and conclusions of law as to whether the challenged statement was voluntary." *Urias v. State*, 155 S.W.3d 141, 152 (Tex. Crim. App. 2004). The statute is mandatory. *Id.* When there are no written findings, the proper procedure is for the appellate court to abate the appeal and remand it to the trial court for the

entry or findings and conclusions. *Id.*; *Wicker v. State*, 740 S.W.2d 779, 784 (Tex. Crim. App. 1987).

Appellant therefore moves this Honorable Court to abate this appeal and remand the case for to entry findings and conclusions. However, Appellant will submit his briefing on the issue, with the request that additional briefing be permitted later, if necessary.

**Introduction.**

Early in this case, Mr. Trevino's original counsel, who was not his ultimate trial attorney, filed a written motion to suppress, which sought suppression of physical evidence seized by police, as well as statements made after the seizure. (CR, 43-45). That motion was not heard by the court and is not the subject of this Point of Error. Rather, this Point of Error concerns an oral motion to suppress Mr. Trevino's recorded statement to detectives, as preserved on State's Exhibit 12.

**Oral motions to suppress.**

A proper oral motion to suppress will preserve error as well as a proper written motion. *Krause v. State*, 243 S.W.3d 95, 103 (Tex. App. – Houston [1st Dist.] 2007, pet ref'd). A motion to suppress is a specialized objection to the admissibility of evidence, which may – but is not required to be – resolved in a pre-trial hearing under Article 28.01 of the Code of Criminal Procedure. *Black v.*

*State*, 362 S.W.3d 626, 633 (Tex. Crim. App. 2012). A motion to suppress must meet all the requirements of an objection in that it be timely and specific enough to inform the trial court of the complaint. *Krause*, 243 S.W.3d at 102; *see* TEX. R. APP. P. 33.1(a) (West 2015). "If the defendant's … motion to suppress is timely and sufficiently specific to inform the trial court of the nature of the complaint, the complaint is preserved for appeal." *Krause*, 243 S.W.3d at 102. In this case, the oral motion to suppress and the court's ruling on it were preserved for appellate review.

**The motion to suppress and the hearing.**

The jury was excused for the motion to suppress hearing. (RR 4, 12). The attorney for the state announced that she was going to offer into evidence Mr. Trevino's recorded statement to the police. (RR 4, 12-13). Defense counsel stated the basis for her motion: "I've notated the exact hour, minute, and second that I think his – that this questioning turned into custodial interrogation requiring *Miranda*. So that's just basically what I'd like to argue, that anything after that time should be suppressed because he was not provided his *Miranda* warning until fairly later on in that statement." (RR 4, 13).

Counsel advised the court that this issue first arose at 6:17:28 on the video, at which time it became an unwarned custodial interrogation. (RR 3, 14). The trial court watched the video from 6:13:20 to 6:33:45. (RR 4, 16). Following the

20

viewing, defense counsel argued that this became a custodial interrogation at the relevant time, and stated that the interrogation violated Articles 38.22 and 38.23 of the Texas Code of Criminal Procedure. (RR 4, 17). Counsel asked the court to suppress everything on the video after 6:17. (RR 4, 19). Defense counsel argued that what started out as a voluntary statement turned custodial. (RR 4, 21). Based on its review of approximately 20 minutes of the video, the trial court denied the motion to suppress. The trial court allowed defense counsel to have a running objection. (RR 4, 24).

Later, with the jury present, the State offered the DVD into evidence. Defense counsel reasserted her objection, which the court overruled. The exhibit was admitted into evidence. (RR 4, 32). The video was played for the jury, as described in the Statement of Facts portion of this brief. The court's jury charge contained language tracking TEX. CODE CRIM. PROC. Art 38.23(a) (West 2005) and instructing the jury to disregard Mr. Trevino's statement if it believed that it was not freely and voluntarily given. (CR, 198). Defense counsel argued to the jury that the statement was not freely given and should not be considered by the jury. (RR 7, 36-38).

**The atmosphere changes in the interrogation room.**

The early part of the interview was conducted in a cool, businesslike manner. At 6:17:28, the police began to "escalate" the interview.[7] The tone got loud and accusatory: "You were alone with your child, OK, and now your child is dead, and it's not SIDS. It's not congestions [sic]. She has brain injuries. OK. The child was killed by someone. The only 'someone' who was in the room with her, from the time you laid her down until the time you find her, is you." (SX12, 6:17:28 – 6:17:50). The detective became sarcastic and asked if someone sneaked in the window to hurt her. (SX12, 6:18:10). The detective reminded Mr. Trevino that the baby was fine when the last person other than him saw her. (SX12, 6:18:51).

The second detective in the room,[8] the "good cop," reminded Mr. Trevino that they were not saying he was a monster. (SX12, 6:20:36). The officer observed that accidents happened and that he had an accident while going down the stairs with one of his own children. (SX12, 6:21:00). This caused Mr. Trevino to admit that she did fall once. (SX12, 6:21:13). He admitted that it was his fault she fell. (SX12, 6:21:58). He did not tell anyone because he was scared. (SX12, 6:22:28). Both officers left the room at 6:25:40 and Detective re-entered with Detective

---

[7] *See* Detective Carrion's use of this word with regard to the interview of Andrea Hernandez. (RR 6, 13).
[8] Detective Richardson. (SX12, 6:08:30).

Jesse Salame at 6:27:18. Detective Salame told Mr. Trevino that what he said was not entirely true, and the police could prove it in several ways. (SX12, 6:27:55). "What you described is not how it happened." (SX12, 6:30:14). "You're willing to bet your whole life on that lie?" (SX12, 6:32:22). Additional relevant things said by Mr. Trevino are summarized in the Statement of Facts section of this brief.

**Standard of review.**

An appellate court reviews a trial court's ruling on a motion to suppress under an abuse of discretion standard. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). The review is conducted in the light most favorable to the trial court's ruling. *Gutierrez v. State*, 221 S.W.3d 680, 687 (Tex. Crim. App. 2007). The appellate court gives almost total deference to the trial court's rulings on questions of historical fact, and on application of law to fact questions that turn on credibility and demeanor, but reviews *de novo* rulings that do not turn on credibility and demeanor. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007). The appellate court must uphold the trial court's ruling if it is supported by the record and is correct under any theory of law applicable to the case. *Armendariz v. State*, 123 S.W.3d 401, 409 (Tex. Crim. App. 2003).

**Motions to suppress custodial statements.**

<u>Federal standard</u>

"The Fifth Amendment to the United States Constitution commands that no person 'shall be compelled in any criminal case to be a witness against himself.'" *Herrera v. State*, 241 S.W.3d 520, 525 (Tex. Crim. App. 2007). The warnings mandated by *Miranda v. Arizona*, 384 U.S. 436, 442-57, 467-79 (1966) "were established to safeguard an uncounseled individual's constitutional privilege against self-incrimination during custodial interrogation." *Herrera*, 241 S.W.3d at 525. Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. "Unwarned statements obtained as a result of custodial interrogation may not be used in evidence by the State in a criminal proceeding during its case-in-chief." *Herrera*, 241 S.W.3d at 525.

"A person is 'in custody' only if, under the circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest." *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996). There are four general situations which may constitute custody: (1) the suspect is physically deprived of his freedom of action, (2) the police officer tells the suspect that he is not free to leave, (3) the police create a situation that would lead a reasonable person to think that his freedom of movement has been significantly restricted, and (4) there is probable cause to arrest the suspect,

and the police do not tell him that he is free to leave. *Gardner v. State*, 306 S.W.3d 274, 294 (Tex. Crim. App. 2009). The fact that the officer would have let the defendant leave if so asked does not prevent questioning from being interrogation. *Ancira v. State*, 516 S.W.2d 924, 926 (Tex. Crim. App. 1974).

State standard

Oral statements against interest made by suspects in custody are not admissible unless made in compliance with TEX. CODE CRIM. PROC. art. 38.22 (West 2005). *Shiflet v. State*, 732 S.W.2d 622, 623 (Tex. Crim. App. 1985). Article 38.22, § 2, requires that the officer read the suspect certain specified rights, which include the mandated *Miranda* rights, plus an additional state-created right, and that the defendant knowingly, intelligently, and voluntarily waived his rights. *Herrera*, 241 S.W.3d at 526. This requirement does not apply to a statement that does not stem from custodial interrogation. Article 38.22, § 5. The interpretation of custody for purposes of Article 38.22 is consistent with the meaning of that term for *Miranda* purposes. *Id.*

**Mr. Trevino's statement was custodial.**

Whether judged under the Fifth Amendment or Article 38.22, Mr. Trevino was in custody when Detectives Garvelli, Richardson, and Salame interviewed him, at all times after 6:17:28. "The 'reasonable person' standard presupposes an *innocent* person." *Dowthitt*, 931 S.W.2d at 254 (citing *Florida v. Bostick*, 501 U.S.

429, 438 (1991))(emphasis in original). An innocent person under these circumstances would have been terrified. An innocent person would be grieving over the recent sudden death of his infant daughter, and would have been have been preoccupied with that, to the exclusion of almost anything else. Such an innocent person would have be intimidated and outraged over the whole business of being interrogated by homicide detectives.

The DVD contains numerous references to Mr. Trevino being free to leave, although not during the 20 minutes viewed by the judge at the suppression hearing. (SX12, 5:29:44, 6:34:55, 6:48:20, 6:55:40, 7:00:00, 7:04:55, 7:06:50, 7:29:30). However, the DVD contains comments by the detectives of a much darker hue, which indicate that the officers created a situation that would lead a reasonable *innocent* person to believe that his freedom of movement was significantly restricted. *Gardner v. State*, 306 S.W.3d at 294.

During the except of the DVD that the trial court considered, Detectives Salame and Richardson re-entered the interrogation room, and Detective Salame's tone became accusatory: "I understand why you would say what you said, but I'm also going to tell you that that's not entirely true. OK, and I'm going to tell you that I know that and I'm going to tell you that we're going to be able to prove that." (SX12, 6:27:48 – 6:27:57). The detective thus told Mr. Trevino that he was lying, and that the detectives could prove that he murdered his daughter, no matter

what Mr. Trevino said or did not say. "The worst thing that you could do right now is to come in here and lie again." (SX12, 6:28:18). The unstated significance of that threat is that Mr. Trevino's inevitable, provable, prosecution would end in a worse result if he continued lying. "What you described is not how it happened." (SX12, 6:30:11). Translation: You are a liar. You murdered your baby. We can prove it. "If you're not going to be honest about what happened, then all this is for nothing and it's going to make you look bad. It's going to make you look worse, because all those injuries than what you're describing." (SX12, 6:31:10 – 6:31:20). Translation: If you don't confess, you will get a higher sentence at your trial. "You're willing to bet your whole life on that – on that lie?" (SX12, 6:32:11). Obviously, betting one's whole life concerns the length of his prison sentence or, since this case might have gone capital, literally betting one's life. Being remorseful "makes a difference". (SX12, 6:32:47). Translation: Tell us the truth and you won't be sentenced as harshly.

Although not stated overtly, these detectives were instilling in Mr. Trevino the message that they could get a murder – or even capital murder – conviction and that it would be better for him in the long run if he came clean.[9] You're gonna get convicted and sentenced, and the question is: for how long. Sure you can leave, but

---

[9] Later, in a part of the video that was not played for the jury for obvious reasons, the detectives dropped the façade and told Mr. Trevino that the rules would soon change and that he would be prosecuted, that there would be a judge and a jury, and that the prosecutor would call him a baby killer. (SX12, 7:17:50 – 7:17:35).

we're gonna come for you real quick, and after that you won't be able to leave. Freedom of movement for a few minutes or a few hours is meaningless. Mr. Trevino was in custody after 6:17:28. He was not warned. His statement after that time was inadmissible and should have been suppressed.

**Harm analysis.**

A violation of the Fifth Amendment is *ipso facto* a constitutional error. Therefore, the trial court's error under *Miranda* was reversible unless this Honorable Court determines beyond a reasonable doubt that the error did not contribute to the conviction. TEX. R. APP. P. 44.2(a) (West 2015). Mr. Trevino's admission led directly to his indictment and conviction for murder. Mr. Trevino is entitled to a reversal and a remand for a new trial.

## Conclusion and Prayer

WHEREFORE, PREMISES CONSIDERED, the Appellant prays the Court of Appeals abate this appeal and remand for the entry of findings of fact and conclusions of law, and on final decision, to uphold the point of error, reverse the judgment of conviction and remand for a new trial.

Respectfully submitted,

/s/ *Michael D. Robbins*
MICHAEL D. ROBBINS
Assistant Public Defender
Paul Elizondo Tower
101 W. Nueva St., Suite 370
San Antonio, Texas 78205
(210) 335-0701
FAX (210) 335-0707
mrobbins@bexar.org
Bar No. 16984600
ATTORNEY FOR APPELLANT

## Word Count Certificate of Compliance

Pursuant to TEX. R. APP. P. 9.4(i)(1) & (i)(2)(B) (West 2015), the word count, from the beginning of the Statement of Facts until, but excluding, the signature block, is 6,189. The total word count is 7,584. The Appellate Public Defender's Office uses Microsoft Word 2010.

/s/ *Michael D. Robbins*
MICHAEL D. ROBBINS
Assistant Public Defender

## Certificate of Service

I HEREBY CERTIFY that a true and correct copy of the above and foregoing Brief For Appellant has been emailed to the Bexar County District Attorney's Office, Appellate Division, Paul Elizondo Tower, 101 W. Nueva St., Suite 710, San Antonio, Texas 78205, on June 15, 2015.

/s/ *Michael D. Robbins*
MICHAEL D. ROBBINS
Assistant Public Defender